KOEHRING COMPANY *v.* HYDE CONSTRUCTION COMPANY, INC.

No. 43572 October 4, 1965 178 So. 2d 838

215

216

February 7, 1966 182 So. 2d 580

*William A. Denny, Jon F. Friedl,* Milwaukee, Wis.; *Butler, Snow, O'Mara, Stevens & Cannada, Barnett, Montgomery, McClintock & Cunningham,* Jackson, for appellant.

*Cox, Dunn & Clark,* Jackson, for appellee.

222

RODGERS, J.

This case grew out of the following facts and circumstances: On November 18, 1959, a contract was awarded to Hyde Construction Company, Inc. in the amount of $16,173,876.86 for the construction of a large concrete spillway, Keystone Dam, Arkansas River, in the State of Oklahoma. The specification of the United States Corps of Engineers, as incorporated in the contract, required that the contractor erect a suitable concrete plant of sufficient capacity to satisfactorily batch, mix and discharge two hundred cubic yards of concrete per hour, and sixteen hundred cubic yards of concrete in any eight-hour shift. The specifications also required that the concrete be placed in the facility at a certain temperature. The Hyde Construction Co., Inc. (hereinafter called Hyde) went about securing a plant and equipment that would produce a concrete mix required by the contract, and entered into negotiations with the Koehring Company (C. S. Johnson Company, Division, hereinafter called Koehring) for the purchase of a plant to manufacture the required mix.

Koehring proposed the installation of a cooling and heating facility, which was to operate on a vacuum principle. Hyde was experienced in the operation of a concrete mixing plant of similar make and design which had been previously sold and offered by Koehring, but

had had no experience with the proposed vacuum cooling system or equipment necessary to control the temperature of the mix proposed to be manufactured by Koehring. A contract was negotiated between the appellant and appellee on February 5, 1960, in which Koehring guaranteed that its cooling plant would operate to the satisfaction of Hyde, but it is charged that the plant failed to operate as guaranteed and as a result of the failure of the plant and system to operate and produce the required cement mix from the date of installation, the progress of the work on the Keystone Dam Project was thereby greatly delayed, resulting in many "shutdowns" and periods of loss of time and labor efficiency, resulting in great damage to Hyde in the sum of $500,000.

On August 30, 1961, in Civil Action No. 3175, Hyde exhibited its complaint in the Federal Court at Jackson, Mississippi, wherein it sought a money judgment against Koehring for the breach of the contract and warranty set out in the sale contract for the concrete mixing and cooling plant. This bill of complaint also made two companies defendants by way of attachment. Dalrymple Equipment Company was named attachment defendant in the State and Federal Courts. It was alleged that each of the attached defendants knew of other residents having effects of the non-resident defendant Koehring and others who were indebted to it. Attachment was requested under the method set out in Mississippi Code Annotated sections 2729 through 2734, inclusive (1956). The complaint also charged that there was diversity of citizenship existing between the complainant on the one hand and Koehring (C. S. Johnson Division) on the other. The complaint asks that the court enter a decree in favor of the complainant, jointly and severally, against the non-resident defendant in the full sum of $500,000, with legal interest and the cost of court, and that the funds and effects in the hands of the attached defendants

be condemned for the satisfaction in whole or in part of a money decree. It requests that judgment be entered as provided by law in such cases against the attached defendants upon a recovery of judgment. The bill of complaint alleged that Koehring was a foreign corporation, doing business in Mississippi, without having qualified and appointed an agent for process, thereby calling into play the statute which designated the Secretary of State as agent for process. Koehring filed no answer in the Federal action, but instead filed a special appearance in the form of a motion to dismiss for want of jurisdiction.

Koehring's motion to dismiss the Federal action for lack of jurisdiction also included a request in the alternative, that the court transfer the case to the Federal District Court of Oklahoma under section 1404 (a), Title 28, U. S. C. A. This motion was overruled; whereupon, Koehring appealed to the Court of Appeals of the Fifth Circuit. Thereafter, on September 27, 1961, while the above-mentioned suit was pending in the Federal District Court at Jackson, Hyde filed a suit in the State Chancery Court of the First Judicial District of Hinds County, Mississippi, setting out an identical cause of action theretofore filed by Hyde in the Federal Court.

In the State Chancery Court suit, Hyde also invoked a non-resident or attachment statute of Mississippi and Dalrymple Equipment Company again was made a resident attachment-defendant. The State Chancery Court action remained relatively dormant while proceedings were had on Koehring's appeal from the decision of the Federal Court in Mississippi.

While the appeal in the Fifth Circuit was pending in the Federal Court suit, Koehring filed its answer in the State court on January 30, 1963, thereby entering its appearance in the Chancery Court proceedings. In this answer, Koehring pleaded the pendency of the prior Federal court action, and alleged that the issue in the

former Federal Court suit and the issue set out in the State Chancery Court suit was the same, and that the prior Federal Court suit was brought as a *quasi in rem* proceeding. Koehring requested in its answer that the Chancery Court suit should be dismissed or stayed, pending the disposition of the earlier filed Federal Court action. However, no plea in abatement was filed and no proof of a restraining order was made prior to the entry of the final decree in the State Chancery Court. On September 19, 1963, the Court of Appeals for the Fifth Circuit rendered an opinion in the Federal Court proceeding which pretermitted the jurisdictional question, but reversed the lower U. S. Court directing that the Federal Court suit be transferred to the First District for the Northern District of Oklahoma.

After the U. S. Fifth Circuit Court had rendered its opinion, Hyde requested that the State Chancery Court suit be set for trial. Koehring requested that the state court stay or dismiss the proceeding because of the prior proceedings filed in the Federal Court but this motion was overruled. The Chancery Court then set the state case for trial to be held Monday, March 9, 1964. During this time, Hyde had filed a petition for rehearing in the U. S. Fifth Circuit, and Koehring had filed in the same court a motion for an injunction to restrain Hyde from proceeding to trial in the State Chancery Court suit. On January 27, 1964, this motion was overruled without prejudice to Hyde's right to apply to the Oklahoma Federal District Court, to which the case was remanded, for a transfer back. February 5, 1964, the Fifth Circuit denied Hyde's petition for a rehearing. On February 14, 1964, the U. S. Fifth Circuit issued its mandate reversing the District Court's previous judgment of September 19, 1963, which *inter alia* "ordered and adjudged" that the case "be and it hereby is remanded to the . . . Court for the Mississippi Southern District with instructions that it be transferred to the Northern

District of Oklahoma. . . ." Thereupon, Hyde attempted to dismiss his action in the Mississippi Federal Court. After the District Court entered an order of dismissal on February 24, 1964, Koehring petitioned the U. S. Fifth Circuit Court for a writ of mandamus to have the dismissal order vacated and the action immediately transferred to the Oklahoma Federal District Court.

The hearing on the petition for a writ of mandamus in the U. S. Fifth Circuit (by order dated March 6, 1964) temporarily enjoined Hyde from proceeding further in the Mississippi Chancery Court action. On March 10, 1964, the Fifth Circuit Court of Appeals held that the Federal District Court in Jackson had committed error in allowing Hyde to dismiss the Federal Court suit. Thereupon, the Fifth Circuit Court directed a vacation of the order of dismissal which had been entered by the Federal District Court in Jackson on February 24, 1964, and ordered the Clerk of the Federal Court in Jackson to immediately transfer the record in that case to the Clerk of the Federal Court of the Northern District of Oklahoma. It further ordered that pending the physical filing of that order in the Oklahoma Court, the Fifth Circuit's order would "constitute a transfer to enable the parties to present the matter to the District Court in Oklahoma." The U. S. Fifth Circuit Court found that the immediate transfer to Oklahoma would protect and effectuate the order of the Fifth Circuit Court, and thereupon vacated the temporary injunction restraining Hyde from proceeding further in the Chancery Court action. The cause thus transferred to the Oklahoma Federal District Court became Civil Action No. 5911 on the docket of that court.

Although, as previously stated, the Mississippi Chancery Court suit was set for trial on March 9, 1964, it was continued for hearing until March 11, 1964. At a hearing, participated in by counsel for both Hyde and Koehring on March 11, 1964, the Federal District Court

in Oklahoma, prior to 2 P. M. and prior to the commencement of the trial in the State Chancery Court suit, issued a temporary restraining order against Hyde, its attorneys and those in concert with them, from proceeding with the trial in the State Chancery Court. Notice of a temporary restraining order was transmitted to Jackson *by telephone* and announced in open court at the outset of the trial, and the attorneys for Koehring requested that Koehring be granted permission to refrain from proceeding in the Chancery Court suit. Never-the less, the State Court directed that the case proceed to trial as previously ordered.

The Chancery Court proceeded with the trial of this cause until it was completed on March 25, 1964. On April 7, 1964, the Chancery Court rendered an opinion in favor of Hyde, and on April 8, 1964, entered a final decree in favor of Hyde, against Koehring, awarding a money-judgment in the sum of $464,450.08. Thereafter, Koehring filed a petition in the State Chancery Court asking for a rehearing, and asking the court to vacate its former decree. This petition set forth, among other things, that Hyde should not have been permitted to have proceeded in the Chancery Court suit after *notice* of the various restraining orders issued by the Oklahoma Federal District Court. A response was filed by Hyde to this petition, and the petition was overruled. Koehring perfected the present appeal with supersedeas from the money-judgment of April 8, 1964. Thereafter, on September 1, 1964, the Oklahoma Federal District Court rendered an opinion, ordering and adjudging in that Court (in Civil Action No. 5911) that sanctions be imposed against Hyde and its attorneys for contempt of court.

I

## STATE COURT JURISDICTION

The question then to be determined in the outset is, whether or not the Federal Court, having first acquired

jurisdiction of the subject-matter and the parties, had *exclusive* jurisdiction, so that the Chancery Court of Mississippi had no jurisdiction to try the case filed in the State Court.

The conflict in jurisdictions of the Federal and State Courts under our system of government had given rise to considerable controversy in the various opinions of courts, both of the states and of the Federal jurisdictions. It is pointed out in 21 C. J. S., *Courts,* section 522 (1940) at p. 791 that:

"The courts of the United States and the courts of the various states are independent of each other, except as judgments of state courts are subject to review by the federal supreme court, as indicated in the C. J. S. title Federal Courts §§ 238-271 . . . So ordinarily the pendency of a suit in a federal court is not a bar to a suit in a state court involving the same controversy, and vice versa. However, the two courts are not foreign to each other; they form one system of jurisprudence, which constitutes the law of the land, and should be considered as courts of the same country, having jurisdiction partly different and partly concurrent, and as a matter of comity one of such courts will not ordinarily determine a controversy of which another of such courts has previously obtained jurisdiction. . . ."

 █ As a general rule, the grant of jurisdiction to the Federal Courts does not of itself imply that the jurisdiction is to be exclusive. █ So, where a right of action, given by a statute of the United States, is an advancement of the common-law right, existing independently of the relation of Congress in pursuance of the powers delegated by the Constitution of the United States, the concurrent jurisdiction of the State Court is not taken away. █ Also, where the State Courts have long enjoyed jurisdiction over the subject-matter of an action, jurisdiction is not withdrawn by federal statute unless such an intention is distinctly manifested.

The author sets out in the textbook, Moore's Federal Practice, 1 A, 2d Edition, section 0.221 (1965) at pages 2605, 2606, the following:

"Where the federal and state courts have concurrent jurisdiction, as, for example, in diversity and general federal question cases, actions *in personam* may proceed concurrently. In other words, as stated in some of the cases, 'the rule . . . has become generally established that where the action first brought is *in personam* and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded.' "

Kline v. Burke Construction Co., 260 U. S. 226, 230, 43 S. Ct. 79, 67 L. ed. 226, 24 A. L. R. 1077 (1922); Equitable Life Assur. Soc. of the U. S. v. Wert, 102 F. 2d 10 (C. C. A. 8th, 1939); Byrd-Frost, Inc. v. Elder, 303 U. S. 647, 58 S. Ct. 646, 82 L. ed. 1108 (C. C. A. 5th 1937), 93 F. 2d 30 (1938).

This textwriter also points out in section 0.222 at pages 2607-2610, inclusive, that:

"In addition to the situation previously discussed, where two *in personam* suits may proceed concurrently, two actions may proceed without interference where one is *in rem* and the other is *in personam,* for irreconcilable conflict arises only when both actions seek to dispose of the same *res.* Thus, where the state court has control of the administration of a decedent's or a ward's estate, an action *in personam* may be instituted in the federal court, the requirements of federal jurisdiction being satisfied, to establish the validity and amount of a claim against the estate, since the federal court's action in no way interferes with the state court's control of the *res.* . . .

". . . Generally, in all cases where the federal action is *in personam* or partly so, even though it includes *in rem* issues which partly overlap the prior jurisdic-

tion of state courts, 'the federal court should proceed to grant any relief appropriate under the pleadings which will not interfere with the specific properties which have been brought within the jurisdiction of the state courts.'

"Therefore, subject to the rule that one court, federal or state, shall not disturb the possession and control of specific property which is within the prior jurisdiction of the other court, one court may properly adjudicate rights in property in the possession of the other court and may render any judgment 'not in conflict with that court's authority to decide questions within its jurisdiction and to make effective such decisions by its control of the property.'

"In *United States v. Klein,* (303 U. S. 276, 281, 58 S. Ct. 536, 82 L. ed. 840, 1938) a leading case in point, the question was whether a judgment of a Pennsylvania court, rendered under authority of a state statute and affirmed by the state Supreme Court, declaring an escheat to the state of money which had been deposited in the Treasury of the United States, was an invasion of federal sovereignty and the prior jurisdiction of the federal court which had disposed of the fund. In an earlier federal action brought by secured bondholders to compel payment of the bonds, plaintiffs had obtained a decree in behalf of themselves and other bondholders similarly situated, the money was paid into court, and the part of the money belonging to bondholders who had made no claim and could not be found had eventually been (re)covered into the federal Treasury. After the lapse of years the Pennsylvania courts declared the money so deposited to be escheated to the state. It was held that there was no conflict with federal authority; that the state decree was merely an adjudication upon the title of the absentees, which was not prohibited, and that the decree was not founded on possession and did not pur-

port to disturb the possession of the Treasury as depository, which it could not do, and that the question of possession would be open for decision whenever application was made to the federal court for payment over of the fund. (Citation supplied.)

"The same principle was approved and applied by the Supreme Court in the decision of Fischer v. American United Life Insurance Company." (314 U. S. 549, 62 S. Ct. 380, 86 L. ed 444, 1942, re'g — C. C. A. 8th, 1941, 117 F. 2d 811) (Citation supplied.)

The appellant contends that it is well-settled that where an action is *quasi in rem,* the court having jurisdiction, first attached, has jurisdiction to proceed to the exclusion of all other courts. It is contended that the case of Donovan v. Dallas, 377 U. S. 408, 84 S. Ct. 1579, 12 L. ed 2d 409 (1964), and the case of Princess Lida of Thurn v. Thompson, 305 U. S. 456, 59 S. Ct. 275, 83 L. ed. 285 (1938), settled the issue here involved in favor of Koehring.

The facts in the *Donovan* case are as follows:

The City of Dallas, Texas, owned Love Field, a municipal airport, and forty-six citizens brought a class suit in a Texas court to restrain the City from building an addition to the runway to the airport, and from issuing and selling municipal bonds for that purpose. The case was tried and summary judgment was given for the City. On appeal, the Texas Court of Civil Appeals affirmed. The Supreme Court of Texas denied review, the United States Supreme Court denied certiorari. Later, one hundred and twenty Dallas citizens, including twenty-seven of the plaintiffs in the earlier action, filed another action in the U. S. District Court for the Northern District of Texas seeking similar relief. The complainants sought an injunction against the construction of the runway, issuance of bonds, and payment of bonds already issued. The City filed a motion to dismiss, and

an answer to the complaint in the Federal Court. At the same time, the City applied to the Texas Court of Civil Appeals for a writ of prohibition to bar all plaintiffs in the case in the U. S. District Court from prosecuting their case in that court. The Texas Court of Civil Appeals Denied relief, holding that it was without power to enjoin litigants from prosecuting an action in the Federal Court, and that the defense of res judicata on which the City relied could be raised and adjudicated in the United States District Court. On appeal from the mandamus order, the Supreme Court of Texas took a different view, however, and held it was the duty of the Civil Court of Appeals to prohibit the litigants from further prosecuting in the U. S. District Court, and stated that a writ of mandamus would issue should the Court of Civil Appeals fail to perform the duty. The U. S. District Court, in an unreported opinion, dismissed the case pending there. One of the petitioners in the Federal Court excepted to the dismissal and appealed to the U. S. Court of Appeals for the Fifth Circuit. The Texas Court of Civil Appeals cited *Donovan* and the other complainants for contempt. Donovan was sentenced to twenty days in jail. Donovan served the sentence and the Supreme Court granted certiorari to review the State Supreme Court's judgment directed to the Civil Court of Appeals to enjoin petitioners from prosecuting their action in the Federal Court, and granted certiorari to review the Civil Court of Appeal's judgment conviction of contempt. The Court held that:

"We think the Texas Court of Civil Appeals was right in its first holding that it was without power to enjoin these litigants from prosecuting their federal-court action, and we therefore reverse the State Supreme Court's judgment upsetting that of the Court of Appeals. We vacate the later contempt judgment of the Court of Civil Appeals, which rested on the mistaken belief that the writ prohibiting litigation by

the federal plaintiffs was 'valid.' '' 377 U. S. at 411-412.

The Court then said:

''Early in the history of our country a general rule was established that state and federal courts would not interfere with or try to restrain each other's proceedings. That rule has continued substantially unchanged to this time. An exception has been made in cases where a court has custody of property, that is, proceedings *in rem* or *quasi in rem*. In such cases this Court has said that the state or federal court having custody of such property has exclusive jurisdiction to proceed. (Princess Lida v. Thompson, 305 U. S. 456, 465-468.) In Princess *Lida* this Court said 'where the judgment sought is strictly in personam both the state court and the federal court, have concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.' *Id.* p. 466. See also *Kline v. Burke Construction Co.,* 260 U. S. 226.'' 377 U. S. at 412.

The opinion of the Court then pointed out:

''But plaintiffs in the second suit chose to file that case in the federal court. They had a right to do this, a right which is theirs by reason of congressional enactments passed pursuant to the congressional policy. And whether or not a plea of *res judicata* in the second suit would be good is a question for the federal court to decide. While Congress has seen fit to authorize courts of the United States to restrain state-court proceedings in some special circumstances, it has in no way relaxed the old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings *in personam* actions like the one here. It does not matter that the prohibition here was addressed to the parties rather than to the federal court itself.

For the heart of the rule declared by this Court is that:

'. . . where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. . . .' '' (Emphasis supplied.) 377 U. S. at 412.

In the case of Pennsylvania General Casualty Company v. Pennsylvania, ex rel., Schnader attorney general, 294 U. S. 189, 55 S. Ct. 386, 79 L. ed. 850 (1934), the United States Supreme Court said:

"Where the judgment sought is strictly *in personam,* for the recovery of money or for an injunction compelling or restraining action by the defendant, both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as *res judicata* in the other. See Buck v. Colbath, supra, (3 Wall. 342, 18 L. ed 260); Kline v. Burke Constr. Co., 260 U. S. 226 . . . But if the two suits are *in rem* or *quasi in rem,* requiring that the court or its officer have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant relief sought, the jurisdiction of one court must of necessity yield to that of the other. To avoid unseemly and disastrous conflicts in the administration of our dual judicial system, see Peck v. Jennes, 7 How. 612, 625; and to protect the judicial processes of the court first assuming jurisdiction . . . the principle applicable to both federal and state courts is established that the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other. This is the settled rule with respect to suits in equity for the control by receivership of the assets of an insolvent corporation." (Emphasis supplied.)

In the case of Wells v. Helms, 105 F. Rep. 2d 402 (1939), the United States Circuit Court of Appeals, Tenth District, pointed out that:

"It is well settled that where two actions involving the same cause of action are pending in a state and a federal court, and are within the concurrent jurisdiction of each, both actions, in so far as they seek relief *in personam,* may proceed at the same time and when one action has gone to judgment, that judgment may be set up in the other action as res judicata." 105 F. 2d at 404.

Kline v. Burke Construction Company, 260 U. S. 226, 230, 43 S. Ct. 79, 67 L. ed. 226, 24 A. L. R. 1077 (1922), gives this exposition:

". . . a controversy is not a thing, and a controversy over a mere question of personal liability does not involve the possession or control of a thing, and an action brought to enforce such a liability does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending. Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of res judicata by the court in which the action is still pending in the orderly exercise of its jurisdiction, as it would determine any other question of fact or law arising in the progress of the case."

■■ ■ Thus it is seen that exclusive jurisdiction vests in the court first acquiring jurisdiction in *in rem* and *quasi in rem* cases but not in *in personam* cases. The question then resolves itself into the query as to what is meant by the expressions "in personam", "in rem" and "quasi in rem" jurisdiction. In 20 Am. Jur. 2d,

*Courts,* section 118 (1965), at page 473, we find the following language:

"The distinction between jurisdiction *in personam* and jurisdiction *in rem,* which to some extent is covered also in other articles, runs through numerous cases, mostly in connection with the doctrine, established by the United States Supreme Court in the case of Pennoyer v. Neff, (95 U. S. 714, 24 L. ed 565) that a state court can acquire jurisdiction *in personam* over a defendant only if process has been served on him in person in the state to which the court belongs, unless he has voluntarily submitted himself to the court's jurisdiction, some later cases noting a tendency to deviate from strict application of the doctrine of Pennoyer v. Neff, notably through use of the 'minimum contracts' test.' " (Emphasis and citation supplied.)

Section 119, 20 Am. Jur. 2d, *Courts* (1965) at pages 473, 474, 475 states:

"A decision in personam imposes a responsibility or liability upon a person directly and therefore binds him personally with regard to every property he possesses, even that over which the court has no jurisdiction *in rem,* and which its decision may therefore not directly affect. On the other hand, a decision *in rem* does not impose responsibility or liability upon a person directly, but operates directly against that particular thing which is called the *res,* irrespective of who is the owner or possessor thereof, and irrespective of whether the owner is subject to the jurisdiction of the court *in personam.* . . .

". . . Jurisdiction *in rem* is right where the decision sought is of a nature to directly affect real property. A court of one state has no jurisdiction to establish, to pass, or to quiet title to real property situated in another state, or to make any other decision directly

affecting real property located in another state, or the title to that real property.

"A decision *in personam* may be rendered by the court of a state with regard to a *res* which is not situated within the state if the decision merely obliges a person subject to its jurisdiction in personam to dispose of the *res,* or to refrain from disposing of it, in the manner prescribed by the decision. . . ." (Emphasis supplied.)

Section 120, 20 Am. Jur. 2d, *Courts* (1965) at pages 475, 476, states:

"According to certain judicial opinions, the classification of jurisdiction as *in personam* or *in rem* is not comprehensive enough, and therefore a third category, jurisdiction *quasi in rem,* has been added. The courts seem not to be in harmony, however, as to the exact meaning of that term and its proper application. Jurisdiction *quasi in rem* has been said to be neither strictly *in personam* nor strictly *in rem.* The term is frequently used to designate an action in personam where a *res is indirectly affected by the decision.* But sometimes proceedings affecting a status or relation, for instance a marital status, are referred to as proceedings quasi in rem." (Emphasis supplied.)

The facts in the case at bar on the question now being discussed have been previously studied and a very comprehensive opinion has been written on this subject. See Dunn v. Stewart, 235 Federal Supplement 955 (1964). In that case the Court said:

"The record before this Court in this case, as it relates to the case in the Chancery Court of Hinds County, Mississippi, demonstrates that the Chancery Court action, being between a Mississippi corporation and a Wisconsin corporation, then contending that it was not doing business in Mississippi, was fully removable. The presence of the attachment defendants in nowise affected removability. Cramer v.

Phoenix Mutual Life Ins. Co. (CA 8), 91 F. 2d 141, cert. den. 302 U. S. 739, 58 S. Ct. 141, 82 L. Ed. 571, rehearing den. 302 U. S. 778, 58 S. Ct. 263, 82 L. Ed. 602. Having elected not to remove or attempt to remove the Chancery Court action, Koehring Company should now be estopped in equity to assert that any irreparable injury occurred to it because discovery procedures available in the Chancery Court of Mississippi were not as efficacious as procedures which would have been available in the Federal forum.

"A deliberate examination of the pleadings in Civil Action No. 5911 (formerly Civil Action No. 3175), and in the State Chancery Court proceeding No. 60,068, discloses that both suits, insofar as the Defendant Koehring Company is concerned, were *in personam* actions. Only a money judgment was sought as to them. Black's Law Dictionary, 4th Ed. 899; 21A Words & Phrases, pp. 278- 287; Ravesies v. Martin, 190 Miss. 92, 199 So. 282, 285. The Chancery Court attachment proceedings, appurtenant to the principal litigation there and the Chancery attachment proceedings in the U. S. District Court, involved one common attachment defendant, Dalrymple Equipment Company, Inc., a Delaware corporation qualified to do business in the State of Mississippi.

"Attachments in Chancery in the State of Mississippi are unique proceedings in the field of attachment law in the sense that the service of the attachment defendant does not bring any fund into the possession, custody or control of the Court, no monies are paid into the registry of the Court, and no bond is required. Mississippi Code 1942, §§ 2729-2734. Garnishment will not lie against the attachment defendant at the initiation of the action. As the Supreme Court of Mississippi pointed out in Gulf Refining Co. v. Mauney, 191 Miss. 526, 3 So. 2d 844, the Chancery attachment defendant occupies no security position at

all; '(h)e is simply a defendant with all the rights and privileges as such and should simply be summoned to answer the suit as any other defendant is summoned.' The distinctions between Mississippi Chancery attachments and attachments at law are also discussed in Mid-South Paving Co. v. Trinidad Asphalt Mfg. Co., 197 Miss. 751, 21 So. 2d 646, 647. Sequestration, injunction and delivery to the Plaintiff under bond are all permissible under the Chancery attachment statutes, but none of these procedures were requested or accomplished in either suit.

"Under the laws of Mississippi, Koehring Company could have entered a special appearance in the Chancery Court to challenge the jurisdiction acquired by attachment. It chose not to do so but defended generally, thus granting to the Court general jurisdiction of the person. Mobile & Ohio R. Co. v. Swain, 164 Miss. 825, 145 So. 627. When it made this election it made the issue of any quasi in rem proceedings as to Dalrymple Company mainly moot. Cf. Pennoyer v. Neff, 95 U. S. 714, 725, 24 L. Ed. 565. In no sense had any fund been taken into the hands of the U. S. District Court in Mississippi by making Dalrymple an attachment defendant. When Dalrymple Company's answers are considered together, they disclose that on the three separate dates on which statements of account between Dalrymple Company and Koehring Company were made, a different set of debt relationships existed on each occasion. Obviously, no funds were actually frozen in Dalrymple Company's hands. "The attachment did not create any conflict between the concurrent State and Federal jurisdictions. Byrd-Frost, Inc. v. Elder, supra, is completely analogous to the proceedings here involved.

"Dalrymple Company's answer in the Chancery Court advances the plea to that court that it has already been attached in the Federal Court proceedings and

a certified copy of the Complaint in the Federal Court action is made an exhibit to Dalrymple's answer in the Chancery Court. Thus, if any funds *had* been taken into custody by the Federal Court proceeding, the Chancery Court, after this notice, would have been bound not to deal with these funds. This Court, of course, must presume that the Chancery Court of Hinds County would take no proceedings which would in any way affect property which was in fact already seized under the proper processes of the U. S. District Court. Rather, the presumption is that the Chancellor would deal correctly with any such claim when, as and if he would take steps to possess or control any part of the attachment subject matter. Douglas v. New York, N. H. & H. Railroad Co., 279 U. S. 377, 49 S. Ct. 355, 73 L. Ed. 747; Harrison v. NAACP, 360 U. S. 167, 79 S. Ct. 1025, 3 L. Ed. 2d 1152.''

Judge Griffith, in his Mississippi Chancery Practice, original volume, section 484 (1925), at page 516 points out: ''The proceeding is one primarily *in rem*; and in order to give jurisdiction in chancery by attachment against a non-resident there must exist the following factors: (1) The non-residence of the debtor; and, (2) either (a) that he owns lands in this state, or (b) that there are effects belonging to him in the hands of a person in this state, or (c) that there is some person in this state indebted to the said non-resident debtor, and (3) the issuance of the proper process against the land, or effects, or debt, as provided by the statute, so as to bring the *res* under the control of the court; and it is well settled that when the jurisdictional facts do not exist the proceedings must be dismissed, even though the non-resident defendant has appeared, provided that in his appearance he raise at the outset the defect as to jurisdiction, and thus does not waive it. . . . And moreover, when the jurisdiction is based upon the ground that there is a resident defendant who has in his hands effects of, or is indebted to, the non-resident debtor, not

only must the resident defendant be such a person as may be joined, but actually he must be made a co-defendant to the suit. . . ."

It will be noted that our attachment proceeding set out in Mississippi Code Annotated section 2729 (1956) ends with the following sentence: "The court shall give a decree in personam against such nonresident, absent or absconding debtor if summons has been personally served upon him, or *"if he has entered his appearance."* (Emphasis supplied.)

■■ ■ From the foregoing facts and authorities, we have reached the conclusion that the Federal District Court in Oklahoma only had *in rem* jurisdiction over the debt owed by Dalrymple to Koehring. Thus, the Federal Court could enjoin the attempted proceedings in the Mississippi Chancery Court only insofar as the dual proceedings to affect the *res* as to the Dalrymple debt — allegedly within the jurisdiction of the Federal Court. The Mississippi Chancery Court decree, however, was a personal judgment against Koehring; it in no way affected Dalrymple's debt to Koehring and the *res* held in the jurisdiction of the Federal Court. It appeared, therefore, the Mississippi judgment is not affected by the Federal injunction and prior proceedings in the Federal Court.

At this point, it should be again noted that the defendant Koehring chose to answer in the State Court, and made no effort to transfer the case to the Federal Court, as was pointed out by Judge Mize in his opinion in Dunn v. Stewart, *supra*. In fact, no point was made by Koehring that the complainant Hyde had filed the case in the Federal Court (except in his answer) until pleadings had been filed after the decree had been finally entered by the Chancery Court. It follows that the State Court had jurisdiction to hear and determine the issue joined between the appellant Koehring Company and Hyde Construction Company, Inc., appellee. Par-

ticularly in view of the fact that the State Court did not attempt to adjudicate or interfere with the *res* involved in the jurisdiction of the Federal Court and between the parties in that court. We are of the opinion, therefore, that the assignment of error on this point is not well-taken.

By way of emphasis, we also point out that we have consistently held, as a matter of comity, that Mississippi would recognize injunctions issued by another state against its citizens to prevent them from bringing suit in Mississippi to avoid the law of that state. Fisher v. Pacific Mut. Life Ins. Co., 112 Miss. 30, 72 So. 846; Equitable Life Assur. Soc. of the U. S. v. Gex' Estate, 184 Miss. 577, 186 So. 659. The injunctions discussed in these cases are, however, injunctions issued by foreign states, and against persons and corporations subject to their jurisdictions. Moreover, these injunctions are against the individuals and not the courts. 43 C. J. S. *Injunctions* § 50 (1945).

██ █ We recognize that the Federal Court, however, has power to enjoin state court proceedings to protect its jurisdiction over the *res*. 28 USC § 2283 (Stay of State court proceedings); De Korwin v. First National Bank of Chicago, 136 F. Supp. 720, (ND Ill. 1955), 235 F. 2d 156 (1956); Alabama Vermiculite Corp. v. Patterson, 149 F. Supp. 534 (WD SC 1955). ██ █ This power, however, does not warrant a Federal Court in enjoining state proceedings, *in personam* or otherwise, that do not interfere with the Federal Court's *in rem* jurisdiction. Albuquerque National Bank v. Citizens National Bank of Abilene, 212 F. 2d 943 (CA 5th 1954).

██ █ Although it may be said that our Mississippi courts have historically recognized the restraining orders of courts of other jurisdictions which have been brought to their attention by way of proper plea, as in the instant case, it is apparent that the trial court cannot be criticized, and certainly not censured, for failing to have recog-

nized an alleged injunction (by way of comity) since the trial court was not properly notified of the federal injunction until after it had rendered its final decree. We are of the opinion that the parties herein should not have been permitted to experiment with the court, and that the trial court acted properly in refusing to recognize (by way of comity) the information that an injunction had been issued against some of the parties in the Federal Court of Oklahoma.

## II

### PLEA IN BAR

It is contended on appeal by the appellee Hyde in a proper plea in bar filed and argued separately, that Mississippi Code Annotated section 1347 (1956) is applicable to the facts in this case with reference to the injunction proceedings obtained during the progress of this case and effectively operates to release all errors in the judgment of the Chancery Court and is in effect a waiver of appellant's right of appeal.

The plea in bar was passed by order of this Court for determination upon final study of this case, and after a study of the record as a whole, we have reached the conclusion that Mississippi Code Annotated section 1347 (1956) is not applicable under the pleadings and facts developed in this case. Moreover, the facts and proceedings involved herein are of such nature, and so unique, as to require a study and determination of the real issues involved. The plea in bar must therefore be overruled.

## III

### ISSUES OF FACT

We are now brought to the main issues presented by this appeal. That is to say, whether or not the appellant violated its contractual obligation which resulted in damages to the other contracting party, the appellee, and if

so, whether or not the alleged damages were properly shown.

The contract between Hyde Construction Company, a Mississippi corporation, and C. S. Johnson, contained the following:

"The terms of this contract are as follows:

"(6) The C. S. Johnson Company guarantees the plant and cooling system to operate to the satisfaction of the buyer and to produce a minimum of two hundred cubic yards of specification concrete per hour.

. . .

"It is proposed to cool the aggregates, including sand and the mixed water by means of a vacuum cooling process. The plant is to provide enough cooling so that two hundred cubic yards of concrete per hour can be provided continuously under assumed temperature conditions herein enumerated. The concrete to have a temperature of 47 degrees out of the mixer.

. . .

"The equipment furnished by The C. S. Johnson Company is as follows:

"Item 21 N
 Initial installation supervision.

. . .

"The C. S. Johnson Company will have a man follow the job until it is operating satisfactorily."

The contract also contained the provision for delivery of the cooling plant, as follows:

"(4) Delivery. After final approval of this proposed contract by our executive, we estimate shipment in approximately 100 working days from our receipt of your written acceptance of drawings, all permits required by law and other information necessary to proceed with the work."

Hyde offered testimony to show that the contract was finally executed on February 13, 1960; that the one hundred working days allowed by the contract for delivery of the plant expired on or about July 1, 1960. Hyde

had scheduled August 15, 1960, when it was expected the concrete pouring would begin. Testimony shows that although Mr. George Holcomb was sent to the Keystone Dam site on the 16-20th of May 1960, as a representative of Koehring in an effort to comply with its contract to design aggregate tanks, however, a part of this tank did not arrive until September 12, 1960. The plant was not put into operation until October 15, 1960. The appellant Koehring offered evidence to show that the plans for the foundation were not submitted to them in time to permit the fabrication of the plant by the date originally scheduled. Moreover, appellant claims that the fact that the part arrived as late as October did not delay the erection of the plant because (1) the ironworkers who were engaged in building the plant went on strike and refused to build it; (2) the plant was erected by carpenters; (3) these workers had more parts available at all times on the job site than they could erect within the scheduled time. Finally, it is alleged there was actually no time lost in building the dam, since it was completed within the time allowed.

We are of the opinion, however, that the record reveals sufficient evidence, actual and circumstantial, from which the chancellor could have concluded that the cooling plant was not delivered to the appellee Hyde within the time required by the terms of the contract and that Hyde was damaged financially as a result of this delay.

IV

Appellee Hyde offered evidence to show that the appellant Koehring violated its guaranty to furnish a cooling plant that would operate satisfactorily; that neither Hyde, the corporation, nor R. W. Hyde, Jr., its President, nor any of the officers or employees of Hyde knew anything about the operation of a cooling plant, and relied entirely upon the reputation, ability and con-

tractual obligation of Koehring to manufacture, deliver and supervise the erection of a cooling plant capable of cooling the aggregate ingredients used in the making of concrete for the Keystone Dam project. The testimony clearly establishes that the officers and agents of appellant Koehring fully understood why the Hyde Construction Company required it to guarantee the satisfactory operation of the cooling plant. The testimony also shows that the cooling plant did not operate satisfactorily until a great many changes and additions were made to the plant, particularly the addition of a third boiler and the installation of additional primers for the three aggregate tanks, although it is admitted that there were a few times when the plant operated properly for a few hours. Testimony introduced by both parties established the fact that Koehring had never manufactured the type of cooling plant it guaranteed to operate satisfactorily in the instant case. Moreover, the agent sent to supervise the installation of the plant, had no previous knowledge or experience in erecting a vacuum cooling plant. It also appeared that there were known methods of reducing the temperature and wetting the aggregate before it was conveyed to the cooling tank, and which were not made known to the Hyde Construction Company by Koehring until long after the cooling plant had failed to operate to the satisfaction of either Koehring, the manufacturer, or Hyde, the contractor. Koehring, while not admitting that the plant failed to operate properly, contended that the many "breakdowns" and "slowdowns" and periods when the plant was inoperative were brought about by other factors, among which were: the operating personnel were inexperienced and inefficient, the water caused the boilers to fail and it was Hyde's duty to furnish proper water, the aggregate was out of specification, the aggregate stockpile was not promptly replenished, and the concrete forms for holding the concrete were not

constructed at the proper time, so that the plant was required to remain inoperative for a long period of time. It also offered evidence to show that the cranes used to lift the cement buckets from the truck were often out of use because of "breakdowns"; that there were not enough "open spaces" on the dam to permit the continuous operation of the plant; and that Hyde did not have sufficient trucks to promptly convey the cement from the plant to the "hole" or monolith where the concrete was actually poured.

We have reached the conclusion on this point, however, that all of the foregoing facts and other evidence detailed and enumerated in this voluminous record were issues of fact for the determination of the trial court on the question of whether or not the manufacturer failed to carry into effect its "guarantee" expressed in the contract between the parties. The trial judge was of the opinion that: "The cooling system of the plant never, at any time prior to the latter part of July, 1961, was satisfactory to the complainant, and during this time the defendant was making changes, additions and substitutions of parts and equipment. The defendant never at any time considered its part of the contract fully executed."

 We are unable to say that the chancellor was manifestly in error in holding that the appellant failed to carry into effect its contractual guarantee, and must therefore affirm the decree on his finding of fact.

## V
## ISSUE OF DAMAGES

The method used in determining the amount of damage in this case has given this Court more trouble than the issue of fact previously outlined, because some of the testimony on damages offered by both parties bordered upon guesswork and uncertainty.

Appellee Hyde offered proof to show that because of the failure of appellant Koehring to deliver the plant

in the time required by the terms of the contract, Hyde was required to expend $11,859.26 overtime expense in erecting the plant. The proof of this item was a matter of bookkeeping and was relatively simple. On the other hand, the proof of the loss of production caused by the failure of the plant to perform as "guaranteed" was a problem of no mean consequence. The complainant Hyde, in an effort to meet the required burden of proof of damages, offered the following method. Hyde divided the operation of the construction of the Keystone Dam into four parts. It then took two periods of time during the erection of the Keystone Dam project, and offered proof to show these periods were comparable in length of time, similar in activity, effort and handicap. It then offered evidence to show that after the plant had been properly erected by Koehring, it produced 15,500 cubic yards of concrete per week, whereas prior to the modification of the plant, it produced approximately 9,900 cubic yards of concrete per week. This was a loss of production of approximately 5,600 cubic yards of concrete per week for a period of nineteen weeks, or a total of 106,400 cubic yards of concrete. It then calculated that 9,000 over the common denominator 15,-500 shows the loss of 36% in production. Hyde offered proof that its fixed expenses (such as overhead depreciation and indirect costs), amounted to $21,100.01 per week, and that a loss of 36% production for a period of nineteen weeks amounted to $136,728.06.

Hyde further offered proof to show that during the period when there was a 36% loss of production due to inability of the plant to produce the required concrete, it was necessary for Hyde to expend $273,865.19 as labor costs to mix, haul and pour the concrete, and that a loss of 36% in production resulted in the loss of $98,588.23; that when this figure has been multiplied by 1.12 (payroll tax and insurance) there was a total loss of $110,318.82 for labor. The 36% loss of production

was thus used to calculate a monetary figure to show damages suffered by Hyde on the separate items of labor and expenses.

In reply to this method of making proof of damage, the Koehring Company offered to show that the periods of time selected by Hyde to show the "unsatisfactory" and "satisfactory" operations of the plant were not comparable, because (1) the personnel in charge of operation of the plant had changed in the two periods; (2) new roads had been built, facilitating the unloading of the cement; (3) new trucks, cement buckets and other equipment, including cement pouring forms, had been purchased in addition to the equipment used during the allegedly "unsatisfactory" period; and (4) more places and spaces were provided for the reception of the concrete in the spillway, and during the "unsatisfactory" period, certain "slow-downs" were caused by the weather and an unexpected fault discovered in the base of the dam. Moreover, it is said, that the 36% loss of production figure did not take into account additional costs of material and labor expended during the "satisfactory" period. Testimony was also offered to show that the assumed 36% calculation of loss does not conform to generally accepted accounting practices, because the fraction used has an erroneous denominator of 15,-500; that this calculation is based on the assumption that full capacity was attained in the use of the cooling plant during the "unsatisfactory period" from March 1961 to July 15, 1961, as well as the "satisfactory period" from July 16, 1961 to December 1, 1961. Moreover, the 36% is said to be based upon the entire cost of the construction, rather than the cost of cement manufacturing alone.

Appellee offered evidence to show additional damages in that Hyde was required to pay $88,202.92 in addition to the original cost of the cooling plant for labor and modifications, and additional equipment, including a

third boiler which was necessary and essential and required equipment as a part of the plant before it would operate "satisfactorily." The chancellor was of the opinion that this additional payment should be recovered as damages to Hyde. We agree that this item was clearly shown by the testimony.

We are also of the opinion that the trial court had ample evidence on which to base the determination that the two periods of time were comparable and that a production loss of 36% was fairly shown by the evidence.

██ ██ Although the method used in obtaining the measure of damages is not entirely without fault, it may be said, as a general rule, that a party who has broken his contract will not be permitted to escape liability because of the lack of a perfect measure of damages caused by his breach. Therefore, a reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of loss is sufficient proof. We are of the opinion that the method used in determining the measurment of damages for the breach of the contract in this case is fair, and this Court will not set aside the judgment obtained for the breach of the contract, although it may be said the method used here is not considered perfect. Nevertheless, except as to one item, we are of the opinion that the proof of damages was sufficient to sustain the judgment. See Billups Petroleum Co. v. Hardin's Bakeries Corp., 217 Miss. 24, 63 So. 2d 543 (1953); Montgomery Ward & Co. v. Hutchinson, 173 Miss. 701, 159 So. 862 (1935); Shell Petroleum Corp. v. Yandell, 172 Miss. 55, 158 So. 787 (1935); Miss. Power & Light Co. v. Pitts, 181 Miss. 344, 179 So. 363 (1938); Hawkins Hdw. Co. v. Crews, 176 Miss. 434, 169 So. 767 (1936); United Press Ass'ns v. McComb Broadcasting Co., 201 Miss. 68, 28 So. 2d 575 (1947); Vicksburg, Meridian R. R. v. Ragsdale, 46 Miss. 458 (1872).

We cannot approve one item of damage allowed by the chancellor against the appellant because we are of the opinion that the court was manifestly wrong in allowing damages for "winter protection." Appellee Hyde offered testimony to show that it had been damaged in the sum of $51,733.71 because — it is said — Hyde was required to make extra expenditure for the winter protection of 138,864 cubic yards of concrete during the period from November 1, 1961, through March 1, 1962. We have reached the conclusion from all the testimony introduced on this item of damage that Hyde would not have completed its pouring of concrete before the Spring of 1962 in any event. Hyde would have necessarily been required to have furnished winter protection during the period for which this claim is made in some quantity of cubic yards of concrete poured. Moreover, the proof as to how much concrete would have been poured, and how much additional cubic yards of concrete — if any — would have required winter protection during this period is speculative. It is unsafe to base a judgment on conjecture. Berry v. Brunt, 252 Miss. 194, 172 So. 2d 398 (1965). The item of winter protection and the interest thereon should not have been allowed, and will be disallowed in the judgment of this Court.

## VI

## QUESTIONS OF LAW

Since we have held in the outset, in this opinion, that the State Chancery Court had concurrent jurisdiction with the Federal Court to try and determine the issues presented in the suit filed in that court, and since we are of the opinion that the suit in Chancery was *in personam* and not *in res*, the court properly proceeded to try the cause and reach a judgment. We are now confronted with the alleged errors of law presented for our consideration on appeal.

■ ■ It is argued that there was no breach of the contract by Koehring as a matter of law because there was no time for performance fixed in the contract, notice and demand was necessary before Koehring could be held liable, and no notice was given to Koehring.

Appellant has cited several authorities from other jurisdictions on this proposition, including 17 Am. Jur. 2d, *Contracts,* section 356 (1964), in support of its contention. An examination of these authorities, however, has convinced us that they are not applicable to this case, not only because the contract required Koehring to supervise the erection of the cooling plant but because appellant's agent sent to aid appellee kept appellant informed of the malfunction of the cooling plant day by day, as the work progressed. The evidence shows that appellant knew about the malfunction of the plant, and was in a constant state of activity in an effort to remedy the defects.

■ ■ It is next contended that the contract did not fix a time of performance when the cooling plant would operate "to the satisfaction of the buyer", and that the plant did finally operate satisfactorily, therefore there was no breach of the contract. We are also of the opinion that this rule is not applicable in the present case, because the warranty, (or "guaranty", as it is called in the contract,) like any other warranty implied or written, took effect at the time of the consummation of the contract, (46 Am. Jur., *Sales,* section 300, 1943). At the time the contract in this case was entered into, it was obviously intended there would be a period during which Koehring would supervise the installation of the equipment. It was intended that the plant should operate after its erection in conjunction with the operation of the "batch plant," for the purpose of pouring concrete. This it never did until it was modified.

■ ■ It is seriously contended that the provision in the contract, whereby Hyde was to pay 25% of the list

price when the plant was operating "satisfactorily", and the fact that Hyde made payment pursuant thereto, operated as a release of all claims for damages for an alleged breach of the contract. We are not intrigued with this argument because the testimony shows conclusively that the Hyde Corporation, and R. W. Hyde, individually, made continuous efforts to get Koehring to remedy the defects in the cooling plant. Every experiment suggested by Koehring was promptly followed, even the expensive suggestion of modification of the plant. Moreover, the appellant Koehring continued its efforts to remedy the defect in the cooling plant after the notes were given. The argument that Hyde waived any breach of the contract requiring the cooling plant to operate satisfactorily, based upon the fact that Hyde gave notes for the purchase price of the equipment after he had knowledge of the defects of the plant purchased and is thus estopped to claim damages for the breach of the warrant, is not well-taken. Appellant has cited the following cases as authority for this proposition: Anderson v. First Securities Co., 185 Miss. 500, 188 So. 548 (1939); Alig v. Lackey, 114 Miss. 392, 75 So. 139 (1917); Colt v. Kelly, 142 Miss. 617, 107 So. 757 (1926); Brewer v. Automobile Sales Co., 147 Miss. 603, 111 So. 578 (1927); Cherokee Mills v. Conner, 164 Miss. 704, 145 So. 735 (1933); Memphis Automatic Music Co. v. Chadwick, 164 Miss. 635, 146 So. 137 (1933).

These cases state the rule that the execution of a new contract or the promise to pay the original notes in consideration of the extension of time to pay the purchase price — after full knowledge of defects in the article purchased — operates to waive a defense to an action for the purchase price on the ground of breach of warranty. It may be pointed out that the case at bar is not a *defense* to the payment of notes based upon breach of a prior warranty known at the time of the execution of the notes (or renewal) for

the purchase price of the articles sold, but the instant action is a suit for damages for the breach of a contract for failure to carry into the effect the "guarantee" set out in the contract. The article purchased under the contract here involved is not such as could be returned to the seller, the contract rescinded and another obtained or purchased upon the open market. The contract in the case at bar involves the purchase of machinery, a plant designed to do a particular job. The plant was massive in design and the installation alone was a stupendous undertaking. The purchase price and installation costs amounted to more than a million dollars. It was designed to operate in conjunction with a concrete "batch plant", and after having been erected, time to pour concrete became a moving factor. The purchaser's purpose in buying the plant was to pour concrete in the adjacent Keystone Dam. This was known to the seller. Hyde had no alternative or opportunity to reject the cooling plant. The work had to proceed, and it was necessary to do everything possible to immediately get production out of the cooling plant. Hyde made arrangements to get an ice plant but appellant made modification to its cooling plant, and Hyde cancelled the order for the ice plant. Both contracting parties continued to do everything possible to make the plant produce. Moreover, the contract required the seller, Koehring, not only to furnish "the initial installation supervision", but to have a man follow the job until it was operating "satisfactorily." The obligation to render defects in the operation of the plant was therefore a continuing obligation which Koehring recognized and performed long after the buyer Hyde had given the notes, now claimed to be a waiver of the "guarantee" set out in the contract. We are of the opinion that the payment of the purchase price, or the giving of the notes for the purchase price of machinery designed for a particular job under the circumstances, as

shown by the testimony in this case, is not a waiver of the warranty clause in the contract, nor is the purchaser estopped to bring an action for damages growing out of the breach of the contract.

It is pointed out by the textwriter in 46 Am. Jur., *Sales,* section 730 (1943), at page 854, that:

"It has been held that the fact that the buyer pays the price after notice of defects in the goods constituting a breach of the seller's warranty does not constitute a waiver of the breach so as to preclude him from maintaining an action therefor. ... Whether giving a note is a waiver is at most a question of fact. Likewise, where the article warranted was purchased on credit, the giving of renewal notes for the price is not necessarily a waiver of the buyer's claim for damages. There would seem to be no ground for a claim that the buyer has waived a breach of warranty of the efficiency and quality of machinery sold by its use of the machinery during continued attempts of the seller to remedy defects therein."

See also Dancey v. Sugg, 46 Miss. 606 (1872); Stillwell Bierce & Smith Vaile Co. v. Biloxi Canning Co., 78 Miss. 779, 29 So. 513 (1901); 77 C. J. S., *Sales,* §347 a., p. 1250 (1952); 77 C. J. S., *Sales,* § 366 c., p. 1287 (1952); Carver Gin and Machinery Co. v. Gaddy, 62 Miss. 201 (1884); Bowers v. Southern Automatic Music Co., 114 Miss. 25, 74 So. 774 (1917); Christian § Brough Co. v. Goodman & Garrett, 132 Miss. 786, 96 So. 692 (1923); Morrow v. Barron Motor Co., 229 Miss. 51, 90 So. 2d 20 (1956).

In conclusion, appellant argues that the evidence in this case preponderates in its favor; that the delays, "shutdowns" and inactivity of the concrete pouring operation at Keystone Dam were not the result of defects in the cooling plant but were brought about by many other causes, including the fact that Hyde was required to pour additional concrete to fill a land "fault"

discovered at the base of the dam. Appellant insists that the court overlooked the testimony of a similar claim filed with the United States Corps of Engineers for the same damages sought in the instant cause of action, based upon a different reason. We feel that we have already answered this argument under Section IV, but again we point out that the various issues of fact have been settled and determined by the opinion of the Chancellor in the decree of the Chancery Court, and with the exception of the amount allowed for winter protection, we are unable to say the Chancery Court was manifestly wrong in its determination of the facts.

 ██ Finally, we are of the opinion that the decree of the Chancery Court awarding damages to Hyde Construction Company against Koehring Company, Inc., should be affirmed, but that the sum of $51,733.71 allowed as extra costs for winter protection, and the sum of $3,155.76 allowed as interest, totaling $54,889.47, should be deducted from the total award shown in the decree of the Chancery Court, against the total sum of $464,-450.08, leaving a balance of $409,560.61. Interest of six percent on the balance from April 1, 1963, (the final interest date shown in the decree of the Chancery Court) until the date of the order of this Court is hereby allowed. The decree of the Chancery Court is hereby affirmed in part (the sum of $409,560.61) and reversed in part, (winter protection and interest, $54,889.47), and judgment is hereby rendered against Koehring Company in favor of Hyde Construction Company in the sum of $409,560.61, plus six percent interest thereon, from and after April 1, 1963.

Affirmed in part, and reversed in part, and judgment rendered.

All Justices concur.

## ON MOTION TO CORRECT JUDGMENT

RODGERS, J.:

The appellee, Hyde Construction Company, filed a motion to correct the judgment heretofore entered in the above-styled cause on the following ground: The amount set out in the judgment of the Court in favor of appellee is excessive since the original amount of $468,450.08 included not only $51,733.71 for ''winter protection'', plus $3,155.76, interest to April 1, 1963, but also $3,163.72 interest from April 1, 1963, to April 8, 1964. In the original judgment of this Court, we subtracted from the original amount allowed by the chancellor in the trial court, the sum of $54,889.47, the total for winter protection and interest to April 1, 1963. However, we did not subtract the interest which was included in the judgment, in the sum of $3,163.72 interest from April 1, 1963, to April 8, 1964.

 We are of the opinion that the judgment of this Court should be corrected by subtracting from the total amount allowed by the chancellor, $464,450.08 — the total sum of the ''winter protection'' $51,733.71 — plus the two items of interest on the winter protection, making a total sum of $58,053.19, leaving a balance of $406,396.89 due by the appellant Koehring Company to the appellee Hyde Construction Company, Inc. The judgment should allow six percent interest from and after April 8, 1964, on the balance due to the appellee.

 It is next contended by the appellee that the judgment of the Court should be amended to include the surety on appellant's supersedeas bond, the Fidelity and Deposit Company of Maryland. We agree that the judgment should be amended so as to include the judgment against the Fidelity and Deposit Company of Maryland, surety on appellant's supersedeas bond, so as to make appellant and the surety jointly liable for the

judgment in favor of Hyde Construction Company against Koehring Company. Mississippi Code Ann. § 1973 (1956).

■■ The appellee contends that the judgment in this case should be amended to apportion the cost of appeal between appellant and appellee because this Court affirmed eighty-seven percent of the amount allowed by the judgment and decree of the chancery court, and appellee should not be required to pay all of the cost of appeal. We also agree with this argument, and the judgment is amended so as to charge fifty percent of the cost of appeal to appellant Koehring Company and fifty percent of the cost of appeal to Hyde Construction Company. Miss. Code Ann. § 1971 (1956); Illinois Cent. R. R. Co. v. George, 241 Miss. 233, 130 So. 2d 260 (1961); Shipman v. Lovelace, 215 Miss. 141, 60 So. 2d 559 (1952); Barry v. Wingfield, 126 So. 842 (Miss. 1930).

■■ Finally, it is claimed by appellee Hyde Construction Company, Inc. that it should be allowed five percent damages on the balance of $406,396.89, due appellee, and that the order of the Court should be amended so as to allow such damages. We are of the opinion that this contention is not well-taken. The judgment should not allow damages of five percent. See Miss. Code Ann. § 1971 (1956); Illinois Cent. R. R. Co. v. George, *supra;* Boyd v. Applewhite, 123 Miss. 185, 85 So. 87 (1920).

The Clerk of the Supreme Court is hereby directed to amend the judgment of this Court entered in Minute Book BN at page 423, dated October 8, 1965, so as to comply with the amendments directed to be made, as above set out.

So ordered.

All Justices concur.

## ON SUGGESTIONS OF ERROR

SMITH, Justice:

Following the affirmance of this case, as reported in 178 So. 2d 838 (Miss. 1965), both parties filed suggestions of error, with supporting briefs. Replies from each side, also supported by briefs, were filed in response to a request of this Court.

We have now reviewed the entire case in the light of the excellent briefs submitted by both sides and have concluded that we should adhere to our former opinion and that both suggestions of error should be overruled.

During the pendency of the suggestions of error, the United States Supreme Court, in an opinion delivered January 17, 1966, in Case No. 593 (not yet reported), styled Koehring Co. v. Hyde Construction Co., Inc., reversed the decision of the United States Circuit Court of Appeals, 10th Circuit, reported as Hyde Construction Company v. Koehring Company, 348 F. 2d 643 (10th Cir. 1965), and held that the United States District Court for the Northern District of Oklahoma had acquired jurisdiction in that case on March 11, 1964.

As we read the January 17, 1966, decision of the United States Supreme Court, referred to above, it does not reach the question of the jurisdiction of the Hinds County Chancery Court to render the decree affirmed by this Court.

The suggestions of error filed by appellant and by appellee are overruled.

Suggestions of Error overruled.

All Justices concur.

## ON MOTION

RODGERS, J.:

The motion of appellee for leave to withdraw certain exhibits filed in the Supreme Court in original form is hereby overruled without prejudice to refile after ap-

pellant's right to make application to the Supreme Court of the United States for writ of certiorari has lapsed.

Motion to withdraw original exhibits denied without prejudice.

All Justices concur.