UNITED STATES of America,
Appellee,

v.

Ernest Franklin ALEXANDER,
Appellant.

No. 8981.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 26, 1963.

Decided Jan. 17, 1964.

---

Theodore A. Snyder, Jr., Greenville, S. C. (Court-assigned counsel), for appellant.

Charles Porter, Asst. U. S. Atty. (John C. Williams, U. S. Atty., on brief), for appellee.

Before BOREMAN and BRYAN, Circuit Judges, and NORTHROP, District Judge.

BOREMAN, Circuit Judge.

Appellant, Ernest Franklin Alexander, and one Robinson were charged in a two-count indictment with violations of the laws relating to the postal service.[1] The first count charged that Alexander and Robinson had taken from an authorized depository for mail matter a letter addressed to Sammie W. Woodall, 205 North Franklin Road, Greenville, South Carolina, containing a United States Treasury check made payable to the addressee. The second count charged the possession of the particular Treasury check which was the "contents" of the letter addressed to Sammie W. Woodall, with knowledge that the same had been stolen, taken or abstracted from an authorized depository for mail matter.[2] Alexander entered a plea of not guilty as to both counts and alone was tried before a jury. Upon his motion, the first count was dismissed as to him and the jury returned a verdict of guilty as charged in the second count. Defendant did not testify in his own defense. The admission, over objection, of certain evidence is challenged on appeal. We think that the defendant is entitled to a new trial.

It is uncontroverted that on the fourth day of February, 1963, two Greenville County Sheriff's deputies, in response to a telephoned tip from an undisclosed

---

1. 18 U.S.C. § 1708 (1958).

2. The two counts of the indictment are as follows:

"COUNT I

"On or about February 4, 1963, in the Greenville Division of the Western District of South Carolina at Greenville, South Carolina, LEONARD LEE ROBINSON and ERNEST FRANKLIN ALEXANDER did steal, take and abstract from and out of an authorized depository for mail matter, to wit, the mail box of Sammie W. Woodall located at 205 North Franklin Road, Greenville, South Carolina, a letter then and there addressed to Sammie W. Woodall, 205 North Franklin Road, Greenville, South Carolina, containing U. S. Treasury Check No. 32,913,837, Symbol No. 3491 in the amount of $106.20 payable to Sammie W. Woodall.

"COUNT II

"On or about February 4, 1963, in the Greenville Division of the Western District of South Carolina, at Greenville, South Carolina, LEONARD LEE ROBINSON and ERNEST FRANKLIN ALEXANDER unlawfully had in their possession U. S. Treasury Check No. 32,-913,837, Symbol 3491 in the amount of $106.20 payable to Sammie W. Woodall, said check being the contents of a letter addressed to Sammie W. Woodall, 205 North Franklin Road, Greenville, South Carolina, knowing the same to have been stolen, taken, and abstracted out of an authorized depository for mail matter."

source, proceeded to a point on Furman Road in Greenville County, South Carolina, where they spotted Alexander and his co-indictee, Robinson, walking along the roadway. Robinson undertook to run away from the officers but was apprehended within a short distance and a check, not here involved, was taken from his person. Alexander offered no resistance and, at the officer's request, took a seat in the rear of the sheriff's car. McCall, one of the deputies, testified that while the other deputy was struggling with Robinson he saw Alexander, who was then seated in the sheriff's car, drop or throw a check out of the car. McCall stated that he retrieved the check and subsequently turned it over to McClure, a government postal inspector who was called in after Alexander and Robinson were taken to the sheriff's office.

There was no direct proof of the material allegations of the indictment. The Government relied entirely upon circumstantial evidence to prove that the check which Alexander had in his possession had been contained in a letter which was taken from an authorized depository for mail matter. A substantial part of that evidence was the testimony of Mrs. Sammie W. Woodall, a widow lady who lived approximately three-quarters of a mile from the spot where Alexander and Robinson were apprehended. She testified that she received each month from the United States a Social Security check made payable to her in the amount of $106.20; that the check came to her by United States mail and was delivered to the mailbox at her residence on the third day of each month, but when the third fell on Sunday the check was always delivered on Monday, the fourth; that on Monday, the fourth day of February, 1963, she left her home in the morning and upon her return in the afternoon the check which she was expecting to receive that day was not in the mailbox; that a check payable to her in the amount of $106.20 was subsequently delivered to

her and she cashed it at a store; that she had never given *any* check to the defendant, Alexander. There was no direct evidence to show that the check, or a letter in which it was contained, had been stolen or taken from Mrs. Woodall's mailbox. Over timely objection by the defense, several government witnesses were permitted to testify as to the terms of the check and a copy of the check was admitted in evidence.

The first witness presented by the Government was C. V. McCall, Special Deputy Sheriff for Greenville County. In addition to his account of the circumstances of the arrest, McCall testified that when shown the check which he, McCall, had given the postal inspector, Alexander admitted having had it in his possession and throwing it from the car. Officer McCall described the check as follows: "It was to Sammie W. Woodall, 205 North Franklin Road, Greenville, South Carolina."

The postal inspector, Earl W. McClure, was the second government witness. He testified that after the defendant's arrest he went to the sheriff's office where he obtained from the arresting officers the check which Officer McCall had retrieved; that he showed the check, which he described as addressed to Sammie W. Woodall in the amount of $106.20, to Alexander who admitted having dropped the check out of the police car;[3] that he subsequently caused the check to be delivered to the payee, Mrs. Sammie W. Woodall, with instructions to cash it; that while the check was in his possession he, McClure, attempted to have a copy made of it with a thermofax machine; that the machine did not reproduce the name and address of the payee and he typed those terms on the copy.[4] The copy prepared by the postal inspector was admitted in evidence and the terms were read to the jury by the inspector.

The next witness called by the Government was Officer Shirley of the Green-

3. McClure further testified that when asked where he got the check, Alexander answered, "It should be obvious."

4. From an examination of the copy of the check which was admitted in evidence, it appears that the date, amount and other

ville County Sheriff's office. After refreshing his memory from notations which he had made, he testified that, in his presence, the defendant admitted to Postal Inspector McClure that he had had in his possession a check which the witness described as payable "to Sammie W. Woodall, 205 North Franklin Road, Greenville, S. C., in the amount of $106.20."

The envelope from which the check was allegedly taken was not produced and apparently was not found. The check itself, although described in detail in the indictment, was not offered in evidence. The record indicates that the check was delivered to the alleged payee and, pursuant to instructions given by the postal inspector, was cashed by her. In the normal course of banking operations the check would have reached the drawee in Birmingham, Alabama. There is nothing in the testimony to show that the check could not have been produced at the trial.

It is the defendant's contention that the admission of the copy and the parol evidence to show the terms of the check, without the production of the check itself or a reasonable explanation of the Government's failure to produce it, violated the "best evidence rule" and constituted prejudicial error. The Government concedes that there was no sufficient foundation laid for the introduction of secondary evidence; it argues, however, that the evidence objected to was introduced to show the *identity* of a specific physical object, namely, the check, and hence its admission was not violative of the best evidence rule.

█ It has often been stated as a universal rule of evidence that the best evidence that is obtainable in the circumstances of the case must be adduced to prove any disputed fact. See, e. g.,

1 Jones, Evidence § 199 (4th ed. 1938); 20 Am.Jur., Evidence § 403 (1958). Although the rule apparently enjoyed a broader application at one time, see IV Wigmore, Evidence § 1177 (3d ed. 1940), it is now generally recognized that the "best evidence" phrase denotes only the rule of evidence which requires that the contents of an available written document be proved by introduction of the document itself.[5] So limited, there is no question as to the meaning of the rule. As stated in 20 Am.Jur., Evidence § 406 (1958):

> "Where proof is to be made of some fact which is recorded in a writing, the best evidence of the contents of the writing consists in the actual production of the document itself. Any proof of a lower degree is secondary evidence which will be received as proof only where nonproduction of the writing is properly accounted for. The contents of a written instrument may not, as a general rule, be proved by parol, unless the failure to produce the paper itself is accounted for. The principle is controlling in every case wherein it is sought to prove the contents of written instruments of any kind whatsoever. * * *"

As defined by McCormick, the rule is that "in proving the terms of a writing, where such terms are material, the original writing must be produced, unless it is shown to be unavailable for some reason other than the serious fault of the proponent." McCormick, Evidence § 196 (1954).

█ It would seem that this case, involving as it does secondary evidence of a writing, without any explanation of the failure to produce the writing itself, is within the mandate of the best evidence rule. The Government argues, however,

---

figures were also typed on the face of the copy.

5. See, e. g., Meyers v. United States, 84 U.S.App.D.C. 101, 171 F.2d 800 (1948), cert. denied, 336 U.S. 912, 69 S.Ct. 602,

93 L.Ed. 1076 (1949); Herzig v. Swift & Co., 146 F.2d 444 (2d Cir. 1945); McCormick, Evidence § 195, at 409 (1954); IV Wigmore, Evidence § 1181 (3d ed. 1940). But cf. Watson v. United States, 224 F.2d 910 (5th Cir. 1955).

that the rule is not applicable here because the purpose of the Government in offering the evidence was only to *identify* the check found in Alexander's possession. With this contention we cannot agree. It is true, as the Government urges, that the best evidence rule is aimed only at excluding evidence which concerns the contents of a writing and testimony as to other facts about a writing, such as its existence or identity, may be admissible. As stated in IV Wigmore, Evidence § 1242 (3d ed. 1940):

> "[T]he rule applies only to the *terms of the document,* and not to any *other facts about* the document. In other words, the rule applies to exclude testimony designed to establish the *terms* of the document, and requires the document's production instead, but does not apply to exclude testimony which concerns the document without aiming to establish its terms: * * *."

Here, however, the very purpose of the evidence objected to was to establish the terms of the check. The identity of the check could be established only by proof of its terms; the check was not described merely in general terms as a physical object, such as "a check" or "a Government check," but instead its terms were set forth with particularity; indeed the copy purported to include its every characteristic. It is clear that the Government's primary purpose was to prove the terms of the check in accordance with the indictment which set forth those terms in detail, including the serial number, symbol, amount and the name and address of the payee. Moreover, the terms of the check, if properly proved, would tend to establish that the check which Alexander had in his possession was the same check which Mrs. Woodall should have received and which should have been delivered to her mailbox. Without proof of its terms, there was virtually nothing in the record to connect the check with the mails or its possession with the offense charged. The terms of the check were vitally material to the Government's case.

A careful examination of certain cases cited by the Government convinces us that they do not support the Government's position.

In Chambless v. State, 94 Okl.Cr. 140, 231 P.2d 711 (1951), the defendant was convicted of the unlawful possession of intoxicating liquor. At the trial of the case, police officers testified that they had seen a federal liquor license bearing the name of the defendant on the wall of a filling station where the intoxicants were found. Subsequently, a certified copy of the license was admitted in evidence. The court, after pointing out that it had recently held that officers could testify to the fact that they had seen a liquor license, stated at 231 P.2d 713, "but we have not permitted them to testify concerning the contents of the license as the license itself would be the best evidence of what it contained." Thus, the court determined that the admission of testimony concerning the contents of the license was error but held that the error had been rendered harmless by the subsequent production of a certified copy.

Also, in State v. Pappas, 195 Wash. 197, 80 P.2d 770 (1938), the evidence concerned a federal liquor license. In a prosecution for the unlawful possession of liquor, the raiding officers testified that they had seen a federal liquor license on defendant's premises but did not testify as to its contents. The court, holding that the testimony was properly admitted, stated:

> "The license, or stamp, was thus a part of the furnishings with which the place was equipped and, being a physical thing, was capable of identification and description by the officers and agents who saw it." 80 P.2d at 771.

Thus, the court treated the license as a physical object not within the scope of the best evidence rule. Significantly, however, the court went on to state:

> "If the license be considered in the aspect of a written document, then it is to be noted that the testi-

mony of the officers was not with respect to its terms, but only with respect to its existence or identity. The rule requiring the production of written instruments or documents applies only to the terms and not to the existence of such documents." 80 P.2d at 771.

We think inapposite also the case of Chicago & N. W. Ry. Co. v. Green, 164 F.2d 55 (8th Cir. 1947), relied upon by the Government. There a brakeman sued the railroad company for injuries sustained in a derailment. The plaintiff was allowed to testify that the train had received a "slow order" when passing through a certain town near the accident. He stated further that the order directed the train to proceed slowly for one and one-half miles. After holding that the trial court erred in refusing a certain instruction requested by the defendant, the court turned to a consideration of asserted errors in the admission of evidence. At 164 F.2d page 63, concerning the testimony that a "slow order" had been received, the court stated: "To make reference to a document by its common designation, even though the designation may in some measure be a characterization of the contents, is elementarily not a violation of the best evidence rule." The court recognized that plaintiff's counsel had gone further and actually elicited testimony concerning the contents of the order, but it pointed out that *the defendant had not objected to the evidence until after it was in and and that the contents of the slow order were again brought out on cross-examination without objection.* Thus, although acknowledging that "the contents of a written order regulating the operation of a railroad train, the violation of which is relied on as negligence, ordinarily are within the application of the best evidence rule," the court held that it was within the discretion of the trial judge "to allow testimony, which is not the best evidence, to stand, where opportunity to

object has existed but is not exercised until after the testimony is given." 164 F.2d at 63. It is well settled that an objection by the party against whom the secondary evidence is offered is necessary to bring the best evidence rule into operation. 1 Jones, Evidence § 202 (4th ed. 1938).

Another case cited by the Government, United States v. Calamaro, 137 F.Supp. 816 (E.D.Pa.1956), is of similar import. There the defendant, a pickup man in a numbers operation, was indicted and convicted of failing to pay the special gambler's tax imposed by the Internal Revenue Code. He moved for a judgment of acquittal and alternatively for a new trial, assigning as error, *inter alia,* the admission of testimony of police officers pertaining to the numbers slips taken from his possession, without the production of the slips themselves. The arresting officers had testified that they had taken from the possession of defendant 48 sheets of paper which were three inches wide and seven inches long, and that there were 1800 notations of three-digit numbers followed by dashes and other numbers on the papers. The officers characterized the sheets as "banker slips." The District Court found no error in the admission of the testimony. Significantly, however, the court emphasized that

"* * * The government was required to prove only that the slips had existed, that they were numbers slips, and that the defendant had been carrying them. *The government had no burden and made no attempt to prove the specific contents of the slips.* Consequently, the best evidence rule has no application to the problem presented by the failure to produce the numbers slips in the present case. * * *" 137 F.Supp. at 818–819. (Emphasis supplied.)

On appeal the District Court's decision in the Calamaro case was reversed [6] but on other grounds.

6. 236 F.2d 182 (3d Cir. 1956), aff'd, United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed. 1394 (1957).

Of the other cases cited by the Government, only one, Banovitch v. Commonwealth, 196 Va. 210, 83 S.E.2d 369 (1954), involved testimony concerning the terms of a written instrument. There the terms were not in issue and the court stated only that the testimony was not secondary evidence.

■ It is correct, as the Government asserts, that the cases cited support the proposition that oral testimony may be allowed to establish the *existence* or *identity* of a written document. But it is significant that each of those cases indicates that the testimony may not go so far as to include the terms of the writing. Such a conclusion is strengthened by a consideration of the purpose of the best evidence rule.

The real purpose of, and reasons for, the best evidence rule are well stated by Dean Wigmore:

"These reasons are simple and obvious enough, as dictated by common sense and long experience. They may be summed up in this way: (1) As between a supposed literal copy and the original, the copy is always liable to errors on the part of the copyist, whether by wilfulness or by inadvertence; this contingency wholly disappears when the original is produced. Moreover, the original may contain, and the copy will lack, such features of handwriting, paper, and the like, as may afford the opponent valuable means of learning legitimate objections to the significance of the document. (2) As between oral testimony, based on recollection, and the original, the added risk, almost the certainty, exists, of errors of recollection due to the difficulty of carrying in the memory literally the tenor of the document." IV Wigmore, Evidence § 1179 (3d ed. 1940).

Little reflection upon the reasons for the rule is required to note its applicability in the present case. Here the indictment alleged the terms of the check with particularity and the Government undertook to prove those terms as circumstantial evidence of the unlawful possession of the check as charged in the second count of the indictment. Any error in such proof could easily have been of significant legal consequence. Consider, for example, the effect of a witness's failure to notice, or a reproducing machine's failure to copy, an indorsement on the back of the check. We are convinced that it was for the purpose of avoiding the possibility of such errors as might have occurred here that the best evidence rule was formulated.

As pointed out by Wigmore, "where a document is referred to as *identical* with or the same as another document, or as helping to identify some transaction or some other physical object, the question is a difficult one; and the ruling will depend upon whether in the case in hand greater emphasis and importance is to be given to the detailed marks of peculiarity or to the document as a whole regarded as an ordinary describable thing." [7] Here the emphasis was clearly and of necessity on the "detailed marks of peculiarity" which the check bore. The Government could not have sustained its burden by merely showing that the defendant had a Government check in his possession; proof was required to establish that the check which the defendant possessed was, to his knowledge, contained in a letter which had been stolen, taken or abstracted from the mail. The prosecution was obviously aware of the fact that in the absence of proof of the specific terms and contents of the check its case must fail. We believe the evidence went beyond that which is permissible for the purpose of identifying a physical object. As between a written instrument and a copy or parol description thereof, the rule operates to accept the former and exclude the latter. As to its contents, the writing is certain; any oral description thereof necessarily involves the frailties of human recollection and any copy, the hazards of faulty

7. IV Wigmore, Evidence § 1244 (3d ed. 1940).

duplication. In addition, there exists the possibility of prejudice or interest influencing either the testimony of a witness or the accuracy of the copy. Given a choice between the two, the law accepts the certain and rejects the uncertain. The defendant is entitled to a new trial.

Alexander assigns as error the suggestions of the District Court as to calling certain witnesses and the participation by the court in the examination of such witnesses. Having noted error in admitting secondary evidence of the contents of the check, we need not consider this contention except to point out that the participation by the court was limited to an effort to establish a proper foundation for the introduction of secondary evidence of the check's contents. Since it is conceded here that a sufficient foundation was not laid, any error in this respect would not be prejudicial.

Reversed and remanded.