L. D. HORNE, as Administrator of the Estate of Eula W. Horne, deceased, and Larry D. Horne, Plaintiffs-Appellees,

v.

GEORGIA SOUTHERN & FLORIDA RAILWAY COMPANY, Defendant-Appellant.

No. 27561.

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1970.

---

Talbot D'Alemberte, Scott, McCarthy, Steel, Hector & Davis, Miami, Fla., Mathews, Osborne & Ehrlich, Jacksonville, Fla., for defendant-appellant.

Aaron S. Podhurst, Robert Orseck, W. H. Beckham, Jr., Podhurst & Orseck, P. A., Miami, Fla., for plaintiffs-appellees.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

This is a diversity action for damages, removed from the state court to the federal district court by the Georgia Southern and Florida Railway Company. Larry D. Horne filed two separate actions for the death of his wife: one for damages under the Florida Wrongful Death Statute, F.S. 768.01–02, F.S.A., and the other, as administrator of the estate, under the Florida Survival Statute, F.S. 46.021, formerly 45.11, F.S.A. Both complaints were predicated upon the alleged negligence of the Railway in striking and dragging Mrs. Horne, from which she died within about two hours. Both suits charged wanton and wilful negligence. Georgia Southern interposed general denials and asserted the affirmative defense of contributory negligence. The cases were consolidated and tried to the same jury. It awarded damages in the amount of $108,500 in the wrongful death case and $45,000 in the survival action. Of the latter award, $30,000 was for punitive damages. Total recovery, $153,500.

We affirm the judgment of the District Court.

On August 29, 1967, as for some years prior thereto, Mrs. Eula Horne was employed on the premises of Hudson Pulp and Paper Company (paper mill) in Palatka, Florida. She was there not as an employee of Hudson but of a food service firm which operated a main cafeteria

and a satellite cafeteria at the plant. She customarily worked a divided shift, three hours in the morning and two in the afternoon. When struck and dragged a distance of 196 feet by one of Georgia's switch engines she had just left the main cafeteria (after 9 A.M.) and was on her way, on foot, to the satellite cafeteria, at another point on the plant property. After her departure from the main cafeteria no one, including the engineer and the train crew, saw her until after she had become entangled with the locomotive and had been dragged as stated. Although she remained conscious for an hour or more after the accident and said at least three times that she knew she was going to die the record contains no statement from her as to how the tragedy occurred.

An analysis of the evidence in the light most favorable to the verdict indicates that this fatality occurred in the following manner.

In going from one cafeteria to another, Mrs. Horne walked along a paved passageway occupied by Switch Track No. 8, of the Railway. It was likewise in constant use by pedestrians in getting from one point in the plant to another. The area was extremely noisy. A witness testified that if one wished to speak to another there he had to get up closely and shout. Mrs. Horne's route led along the west wall of a building adjacent to the switch track. The passageway between the wall and the track is narrow. At one point it is partially obstructed by a protruding ramp, making it necessary that one get very close to the tracks in avoiding it. After the accident, Mrs. Horne's glasses, pocket book, and supplies were found on the east side of the track, near this obstruction, 196 feet north of where the switch train stopped when flagged down by Sylvester Johnson.

The tragedy was first discovered by Johnson as he was about to come out of a door from a building into the passageway. He testified that when he first saw Mrs. Horne, "I thought it was a piece of paper. Then I took a good look and saw it was a human being. I broke out and ran down the track and finally got there * * *. I ran south. I ran around the side of the train trying to get the engineer to stop the train, and before he stopped, he got up, went across the other side of the train, and came back, and by that time he went about four feet, I imagine, and stopped, and I told him that a woman was under the train". Johnson thought the train was running about eight miles an hour, which would be about twice as fast as a rapid walk.

The witness further stated, "[H]er left foot was caught by what I call a cowcatcher * * * and her right foot was down side the wheel, and she was dragging". This witness further stated, "You can hardly hear anything in that area".

The engineer on the switch engine testified that he was backing south, the same direction in which Mrs. Horne would have been walking, with thirteen cars attached ahead of him and none behind him. He estimated that the train was moving six miles an hour. The other three members of the crew were stationed anywhere from one hundred to seven hundred feet north of him. He was facing north, looking to the crewmen for signals, although he said he occasionally glanced behind him. There was no fireman and no one was maintaining a lookout to the rear. The engineer never saw Mrs. Horne until he stopped the locomotive. What all this means is that, with no lookout to the rear, the engineer was backing his train south while he looked north. There was testimony that the engine bells were ringing and that other warning bells and lights in the area were functioning. The latter signals, however, had been turned on when the train first came onto the track about an hour earlier, and operated continuously whether the train was in the immediate vicinity or not. Some witnesses in the vicinity did not hear the train bells ringing immediately prior to the accident.

Dr. Montague, who practiced surgery and orthopedics, examined and attempted to treat Mrs. Horne in the emergency room of the hospital. He testified that she was conscious and answered questions. The left thigh was fractured in the mid thigh region so that the leg was flailing. Numerous ribs on both sides were fractured, so that the chest was likewise flailing and the chest had to be weighted to enable the patient to breathe. The flat, triangular bone in the back of the shoulders was broken. The scalp and flesh on one side of the face was peeled down. The blood pressure was 80/60. In the opinion of Dr. Montague, the farther Mrs. Horne was dragged the more extensive would be her injuries but he would not offer an opinion as to whether the initial blow or the dragging proximately caused her death.

There was evidence to the effect that not long prior to the accident the attention of the Railway had been called to the fact that safety required a fireman in this noisy, congested area but despite these warnings none had been supplied.

The trial judge denied Railway motions for directed verdicts both at the close of the plaintiff's case and at the close of all the evidence.

In this state of the record, the jury returned a general verdict for the plaintiff. Additionally, in response to special interrogatories, the jury found that the Railway was guilty of negligence and of displaying a wanton and wilful disregard for the safety of Mrs. Horne which proximately caused her injuries and death. It also found that Mrs. Horne was contributorily negligent at the time she first came into contact with the engine, that this proximately caused her injuries, but did not proximately cause her death (this being both an action for wrongful death and a survivor's action). It next found that after Mrs. Horne first came into contact with the train the defendant was guilty of a new, independent, and intervening act of negligence for failing sooner to stop the train, that this was not a proximate cause of all of her injuries, that it was the cause of some of them, but the jury could not determine which of the injuries were thus caused. It did find that such was a proximate cause of death.

The Railway seeks reversal on the following asserted errors (1) the charge that the defendant could be found guilty of a new, independent and intervening act of negligence; (2) the charge on "apportionment" where the accident and its aftermath was one continuous event; (3) the charge allowing the jury to find wilful and wanton misconduct from the failure to have a fireman on the switch engine; and (4) the refusal to charge that the elements necessary for punitive damages must be proved by the same burden of proof necessary to prove criminal charges.

Contentions numbered 3 and 4 may be rejected together.

■ We do not burden this opinion with citations from the many Florida cases dealing with punitive damages. We simply note none of them ever suggested that in civil actions conduct justifying punitive damages must be proven by the evidence beyond a reasonable doubt. We rely on Sauer v. Sauer, 2 Florida District Court of Appeals, 128 So.2d 761(1961), citing Carraway v. Revell, Fla., 1959, 116 So.2d 16, as follows:

"The character or degree of negligence necessary to sustain an award of punitive damages must be of a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety, welfare, and rights of others which is equivalent to an intentional violation of them (citation). The court in the Revell case also noted that the character of negligence necessary to sustain a conviction for manslaughter is the same as required to sustain a recovery for punitive dam-

ages with the distinction of course being the degree of proof", 128 So.2d at 762.

■ This, in our opinion, disposes of the argument that the jury here should have been instructed that before it could return a verdict for punitive damages it would first have to believe the essential facts beyond a reasonable doubt. As in all civil cases, belief from a preponderance of the evidence was sufficient.

■ In the same manner, we are of the further view that for a railroad to back a train into the situation already described while the engineer looked the other way and while there was, in effect, no lookout whatsoever, raised a jury question under Florida law on the issue of punitive damages, particularly in view of the warnings which had been disregarded.

This leaves us with Points 1 and 2. At first blush they appear to present serious legal problems. Upon extended reflection, we find in the context of this case that they do not justify a reversal.

It is easy to see how these points achieved such prominence in the trial below. The Railway had struck, dragged, and killed Mrs. Horne. It expected, however, to escape liability on the defense of contributory negligence. Well aware of the danger of that defense, Counsel for the plaintiff pressed the theory that even if contributory negligence barred liability as of the original impact his client could nevertheless recover because of the negligent dragging of the victim after that time when the Railway could have stopped its locomotive. This theory was given the label, "new, independent, and intervening act of negligence". The

battle over this prompted the trial judge to charge at length on the various aspects of that theory of the plaintiff's case. In the midst of it he charged:

"However, if the jury finds that the second act of negligence was merely a continuation of a sequence of events which was set in motion by the first person's negligence and did not operate independently of the original negligence, then the second act of negligence is not an intervening, independent and efficient act of negligence, but in such cases the first act of negligence is the proximate cause of the injury". Record, 852.

This appears to be a correct statement of the law and, by its own terms, under the facts of this case, would further appear to have negated the submission of this issue to the jury see Kenegson v. Gerard, Fla., 1964, 164 So.2d 204.[1] Mrs. Horne was injured and lost her life because the train was moved continuously without any lookout to the rear. The engineer never saw her before his locomotive struck her, or at the time it struck her, or afterwards, until someone ran out and succeeded in getting him to stop the engine. The dragging was the continuation of an uninterrupted sequence of events, set in motion and kept in motion by the original and the same negligence. The engineer did not stop his train and then start up again, all the time dragging the helpless Mrs. Horne.

We have concluded, however, that we need not decide this point; that it does not justify a reversal.

■ The jury found the Railroad guilty of gross, flagrant disregard for the safety of Mrs. Horne, and we have

1. As a general proposition, the use of an intervening cause is a defensive position rather than offensive. In most instances the defendant interjects the concept to avoid liability on the grounds that the intervening cause proximately caused the injuries complained of, thereby eliminating defendant's original negligent act as the proximate cause.

"An intervening cause is one which comes into active operation in producing the result after the negligence of the defendant". Prosser, Law of Torts, (3rd Ed.), § 51, p. 39.

Restatement of Torts, § 441:

"An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed."

already held that this was an issue for the jury to decide.

As far back as 1892 the Supreme Court of Florida held:

"Where a party has inflicted an injury intentionally, or where it has been done through negligence, and hence unintentionally, and his conduct in doing it has been wanton or reckless of its injurious consequences, the contributory negligence of the person injured is not a defense to an action brought by him for such injury." Florida Southern Railway Company v. Hirst, 30 Fla. 1, 11 So. 506, 16 L.R.A. 631. Quoted with approval, Deane v. Johnston, Fla., 1958, 104 So.2d 3, 65 A.L.R.2d 957.

This being the law, the contributory negligence of Mrs. Horne is shorn of its consequences. It furnishes no shield for the Railroad. The "new, independent, and intervening act of negligence" vanishes.

Nor can we see wherein the erroneous submission of this issue, if it was error, prejudiced the Railway. The plaintiff took upon himself the task of going twice through the eye of the needle when to have negotiated it once was all that was necessary. It is true that the litigants converted the issue into a legal Matterhorn, but the jury decided nothing but the facts. From undisputed physical facts there could be little dispute that Mrs. Horne was dragged 196 feet down this spur track. Arguing over the law could neither add to nor detract from that evidence. True, the jury found part of the dragging to have been an intervening probable cause, but the evidence supports liability in any event. There is no real inconsistency between the general verdict on the one hand and the answers to the interrogatories on the other. The error in the charge, if there was one, was harmless and does not justify a reversal and retrial of this case.

Affirmed.

JOHN R. BROWN, Chief Judge (concurring).

I concur in the result and all of the opinion. I would add this only by way of emphasis.

Here a retrial of a long, tedious, hard-fought case is avoided from the confidence that the error in the new and intervening cause issue was harmless. But we can demonstrate its harmlessness only because of the special interrogatories, one of which categorically found that the railroad had been guilty of willful wanton negligence proximately causing injuries and death.

Had that finding not been expressly made we would have been faced with the enigma wrapped in a mystery—the unrevealing general verdict. Never could one, whether man or Judge, divine what subsidiary holdings had led the jury to the general verdict for the plaintiffs. Was it contributory negligence of the decedent? Willful wanton negligence by the railroad in (i) the initial impact, (ii) the continuing injury from failure to discover and stop or (iii) both? Was it new and intervening cause? And on one or more of these possibilities, were damages apportioned as between (i) or (ii) or (iii)?

Worse, the absolute inability of anyone to penetrate this fog would have forced the law to one of its most incongruous fictions—the inescapable assumption that the jury followed only the *wrong* instruction (new and independent cause).

What this means is that the wonderful device of special interrogatories with a general charge (F.R.Civ.P. 49(a))[1] enables both trial and appellate Courts to know precisely what has been found. And here in refutation of occasional

1. Here it was actually under 49(b), a tricky procedure of many pitfalls which were avoided by the jury's being consistent in its general verdict and the answers to the interrogatories determined by us to be decisively significant.

misguided laments from the plaintiffs' bar the device proves the neutrality of its effect and operation. It can hurt but it can help. Really, it should do neither —it simply, but categorically, reflects the jury's assessment of the truth.

The tool is indeed the doubt eliminator. Brown, Federal Special Verdicts: The Doubt Eliminator, in Proceedings of the Annual Judicial Conference, Tenth Judicial Circuit of the United States, 44 F.R.D. 245 at 338 (1967).[2]

2. I am happy to have the company of a leading authority on practice and procedure, Dean Charles Joiner, who said recently: "All persons interested in pre-

serving the jury as a finder of fact should support the use of the special verdicts." C. W. Joiner, July Trials—Improved Procedures, 48 F.R.D. 79, 86 (1970).