**Gerard A. HARRISON and Harrison Ranch, Inc., Plaintiffs-Appellees, Cross-Appellants,**

**v.**

**Carey PRATHER, Defendant-Appellant, Cross-Appellee.**

**No. 29023.**

United States Court of Appeals, Fifth Circuit.

Dec. 16, 1970.

Rehearing Denied and Rehearing En Banc Denied March 9, 1971.

Philip Mansour, Greenville, Miss., Taylor Webb, Webb & Webb, Leland, Miss., for defendant-appellant.

Fred W. Moore, Harry Jed Lawson, Houston, Tex., George F. Woodliff, Heidelberg, Woodliff & Franks, Jackson, Miss., Douglas C. Wynn, Greenville, Miss., for plaintiffs-appellees.

Before BELL, THORNBERRY and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Reluctant because our principal role is to end disputes, we must nevertheless add another chapter to the history of a bitter internecine legal war that flows from the termination of that closest of business relationships—a partnership. Our desire to write finis here is thwarted by conflicting instructions to the jury on the standard of proximate cause applicable to the tort of interfering with the making of a contract. The cause must now go back for a trial under the correct standard.

The plaintiffs, Gerard H. Harrison and Harrison Ranch, Inc. (Harrison), residents of Texas[1] brought suit against Carey Prather (Prather), a resident of Mississippi sewing: (1) a partition of real property under 28 U.S.C.A. § 1655 (1966); (2) damages resulting from the alleged appropriation by Prather of certain partnership personal property and (3) treble damages under 15 U.S.C.A. § 15 (1963), on the ground that Prather allegedly unlawfully prevented Harrison from obtaining a loan in the amount of 1,090,000 dollars from the Prudential Insurance Company of America (Prudential), thereby causing a loss of anticipated profits from future farming operations and cattle business. Prather counterclaimed, alleging that Harrison should be required to honor an agreement to dissolve the partnership and to partition the property; and, that certain partnership property had been appropriated by Harrison.[2] A jury trial, making use of special interrogatories to segregate the jury's action on the various claims, resulted in a net verdict for Harrison. After a remittitur, the verdict was embodied in a judgment in Harrison's favor. The appeal by Prather and cross-appeal by Harrison eventuated.[3]

1. During oral argument in this court, appellant indicated that a question existed as to whether the principal place of business of the corporate plaintiff, Harrison Ranches, Inc., within the meaning of 28 U.S.C.A. § 1332(c) (1966), might not be in Mississippi. This court is without factual basis to resolve this question. Our reference here is not intended to pass upon that issue.

2. This is the second appearance of this action in the appellate court. The suit, as initially filed, was against Carey Prather and his brother, William Prather. William Prather was served with process at his home in Louisiana. Carey Prather claimed that William Prather was improperly served and joined, the trial court agreed, and, on appeal, this court affirmed. Harrison v. Prather, 404 F.2d 267 (5th Cir. 1968).

3. The court below instructed the issue of claimed losses from farming operations out of the case submitted to the jury. Harrison does not assign this action as error on his cross-appeal. The issue is therefore eliminated from the cause.

Among the multiplex issues spawned by this judicial donnybrook, the primary controversy in this forum focuses on Prather's activities relating to Harrison's attempt to obtain the Prudential loan in late 1964 and the consequences of Prudential's declination. Many of the material facts relating to this particular transaction, as developed at the trial, are in sharp dispute, but the following synopsis sufficiently frames the controversy.

This suit had its genesis on December 20, 1963 when Harrison and Prather entered into an agreement creating a partnership named "P & H Farms", which was to last for one year commencing January 1, 1964. The partnership was organized for the purpose of farming lands located in Washington County, Mississippi. During the autumn of 1964, Harrison notified Prather of his desire to terminate the partnership and a formal agreement to such effect was signed by the parties on February 1, 1965.

On December 15, 1964, Harrison made application to Prudential for a loan of 1,090,000 dollars. Prudential declined to make the loan on January 15, 1965. Harrison asserts that Prudential declined the loan because of a conspiracy between Prather and two others which had as its object to destroy Harrison's credit, thereby making it impossible for Harrison to obtain a loan and thus force him to sell his lands at a reduced price. Specifically, Harrison alleges that Prather and his fellow conspirators interfered with the processing of his loan application to Prudential and that this meddling actually killed the loan. Harrison's principal proof of his fiscal ambush was a tape recording of a conversation between Prather and a third party (secretly Harrison's envoy) in which Prather stated that he knew who could stop a loan approval. The taped conversation further tended to establish that one Pickett Myers killed Harrison's loan at Prather's direction. Prather introduced witnesses employed by Prudential who testified that they were in no way influenced by Pickett Myers, but rather that they declined the loan because the loan application forms were incomplete, Harrison's financial statement was weak, the real estate security was located in two states, part of the lands were utilized in cattle operations and the lands had a low ratio of crops allotments to the total acreage.

After a full trial, the jury rendered its verdict on special interrogatories, by which it made specific findings: that Prather personally or in conjunction with others acting in his behalf, wilfully and maliciously interfered with the granting of a loan by Prudential; that Prather's interference proximately contributed in whole or in part to the decision of Prudential to decline the loan; that Harrison incurred losses in connection with his cattle operation during the last part of 1964 and the first part of 1965 in the amount of 86,352 dollars proximately resulting from the said acts of interference; that Prather's conspiracy was in restraint of interstate trade.

The jury also specially found that Prather was liable to Harrison in the amounts of 2,600 dollars for the wrongful removal of parts and equipment by Prather and 750 dollars for the wrongful appropriation of tools in connection with the division of partnership property and that Harrison was liable to Prather for 900 dollars because Harrison had appropriated feed belonging to the partnership. The balance of these findings struck in Harrison's favor in the sum of 88,802 dollars. After first ruling that Prather had not violated the antitrust laws and refusing to treble the jury's loan interference award pursuant to 15 U.S.C.A. § 15 (1963), the trial judge entered a judgment in favor of Harrison for 88,802 dollars.

Prather filed post-judgment motions for relief from judgment, stay of execution, leave to withdraw the original tape recording for analysis by an expert and, in the alternative, for judgment notwithstanding the verdict or a new trial. The district court denied the motion for leave to withdraw the tape recording and denied Prather's motions for relief from judgment and for judgment notwith-

standing the verdict, but sustained his motion for a new trial unless Harrison accepted a remittitur of 43,167 dollars—50 per cent of the amount allegedly resulting from the failure to obtain the Prudential loan. Without protest, Harrison filed the remittitur and the district court entered final judgment in Harrison's behalf in the sum of 45,626 dollars.

On the direct appeal, Prather insists that the district court committed thirteen errors. In the cross-appeal Harrison asserts that three errors occurred. In view of the basis for our ruling here, it becomes unnecessary to discuss all of these contentions. The pivotal issue is the claimed error of the district court in instructing the jury as to the standard to be applied in determining whether Prather's alleged interference caused the disapproval of Harrison's loan. Because we determine that the court adopted an incorrect gauge to measure this critical element and the case must be reversed for a redetermination of this issue under a more stringent rule, we deem it appropriate to pass upon two other issues that may recur upon retrial—(a) were future cattle profits established by competent proof and (b) did the district court err in holding that the federal antitrust laws were not applicable in this case?

## I. THE PROXIMATE CAUSE vs. A PROXIMATE CAUSE

It is not the abstruse concept of probable cause alone that controls our decision in this cause, but, literally, the issue sharpens to whether "the" or "a" is the proper modifier. Even within the dubious logic of semantics, it is apt to observe that seldom has so little led to the downfall of so much.

During his charge the trial judge initially instructed the jury that they would be required to answer an interrogatory providing: "Do you believe from a preponderance of the evidence that the defendant's interference caused Prudential not to make the loan?"[4] However, on taking objections of counsel after completing his charge, the judge observed the quoted interrogatory language conflicted with another interrogatory which provided that liability should be affixed if Prather took actions "proximately contributing in whole or in part to the decision of the Prudential Insurance Company of America to decline the loan. * * *"

To resolve the clear conflict between the sole cause and contributing cause standards in these two statements, the judge proposed to change the former interrogatory to accord with his concept that Prather's actions need not be the sole cause of Prudential's refusal to render him liable.

Prather's attorney objected to this alteration in the interrogatory on the basis that it did not state the correct rule in a claim for interference with the making of a contract, contending that the plaintiffs must prove that the loan would have *but for* the defendant's interference. The judge disagreed.

Back in the presence of the jury, the judge announced and explained the change he was making. He then struck out the typed word "the" with his pen and inserted in its place the word "a". He concluded his remarks by declaring: "I have changed the question to provide whether or not it was a 'proximate cause', not a sole cause." Upon that comment the jury retired to deliberate. Before us, Prather reasserts his position that the *but for* test is the proper guide.

To determine if the verdict of the jury on the contract interference issue should have been permitted to stand, we must pass upon the threshold question as to whether any real distinction can be found between the *but for*, or the proximate cause, gauge and the contributing

---

4. When the interrogatory was typed out it took a slightly different form but with an identical meaning:
Do you believe from a preponderance of the evidence that the defendant's interference was the proximate cause of Prudential not making the loan?

cause, or *a* proximate cause, test. Secondly, we must determine which test is apropos in this cause. Finally, if there is a difference, and if the improper standard was used here, we must decide whether the error was prejudicial.

While sometimes not easily comprehended in a specific factual context, there is a significant difference between the two guidelines and the law has long demanded that this difference be observed. The controversy raised by counsel before us now and, more emphatically, the action of the trial judge in changing the language of the interrogatories and then explaining its significance to the jury, attest to this fact.

 The *but for*, or *the* proximate cause, requirement imposes a greater burden of proof upon the plaintiff than does an *a* proximate cause instruction. The former requires a plaintiff to prove not only that an act caused an event, but that the event would not have occurred without, or but for, the wrongful act. Kramer Service v. Wilkins, 184 Miss. 483, 186 So. 625 (1939). This stricter standard does not attempt to say that there may not be many causes to an event but, rather, declares that unless it can be shown that the wrong would not have occurred had it not been for the particular action in question, then there is no liability. Fant v. Commercial Carriers, 210 Miss. 474, 49 So.2d 887 (1951). The *but for* rule constitutes a rule of exclusion, i. e., it excludes from the ambit of responsibility all acts and omissions which contributed to producing injury or damage unless it can be shown that the wrong would not have happened in the absence of those given causes. An interrogatory phrased in accordance with this requirement would specify, though not expressed in so many words, that the jury could not affix liability unless they found that without Prather's acts Prudential would have approved the loan.

On the other hand, the *a* proximate cause test establishes a broader pathway to liability. When this yardstick is applicable, the defendant's acts do not have to be the single or exclusively efficient factor which caused the injury. *A* proximate cause implies that even if the defendant's act had never occurred the event still would or, at least, could have occurred. The interrogatory used here, as explained by the judge, is a correct embodiment of this less stringent fault measurement.

It is the almost universal value judgment of courts faced with ruling on claims based upon interference with the making of a contract, that the *but for*, or *the* proximate cause, test must be the standard applied.[5] This proposition has been most clearly stated as follows:

> It is essential to a cause of action for wrongful interference with business that it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit. * * * "When the parties have entered into a contract, the terms of which are fixed, the plaintiff is only required to show the malicious interference and the damage proximately resulting; whereas, if the ground of complaint is that he was about to make a contract, he is required to go further and show ·that he was not only 'about to,' but would, but for the malicious interference of the defendants, have entered into the contract." * * * "There must be some certainty that the plaintiff would have gotten the contract but for the fraud. This cannot be left to surmise or speculation." Goldman v. Feinberg, 130 Conn. 671, 37 A.2d 355, 356 (1944).

The logic of applying this narrow gauge for recovery is to be found in the nature of the tort alleged. The plaintiff is not seeking recovery for damages received because something the defendant did has harmed his established and existing right, but, to the contrary, because an expected benefit was not received. His unspoken hypothesis is—I would have benefited from the agreement I was

---

5. 90 A.L.R. 12 (1935).

preparing to make if the defendant had not acted as he did. Thus, most courts have reasoned that the plaintiff in such an action must bear the burden of proving that *the* efficient force which separated him from the anticipated profit was the defendant's tortious intervention.

The Mississippi rule by which we are bound in this diversity action, as it has been declared in Bailey v. Richards, 236 Miss. 523, 111 So.2d 402, 406 (1959), is in harmony with the majority rule.

> The jury was warranted in believing that the appellee had a *reasonable expectation* of the contract's being consummated *except for* the influence and interference of the appellants. (emphasis added).

In determining whether the difference between the two standards amounted to reversible error in the case at bar, we are largely guided by our recent decision in Bender v. Dingwerth, 425 F.2d 378 (5th Cir. 1970), where the jury charge contained an *a* proximate cause—*sole* proximate cause conflict. *Bender* was a Texas based medical malpractice diversity action and the *a* proximate cause standard was proper. We are dealing with substantially the converse of *Bender* in the sense that there, confusion could have permitted too great a burden of proof to be imposed upon the plaintiffs; and, in the instant case, the court's emphatic final requirement imposed too little. A review of the entire charge given in the case at bar reveals that the confusion of proximate cause standards was not limited to the special interrogatories. Some instructions announced the "but for" test; others were worded in terms of imposing liability if the defendant's action was one of the proximate causes of the loan not being made. Therefore, *Bender's* reasoning on the harmfulness in giving a jury an incorrect proximate cause guideline is directly in point. Speaking for the court, Judge Goldberg stated:

> Indulging as we must in the hopeful hypothesis that the jury parses every phrase of the trial judge's charge, we must disagree with the defendant's assertion that this error was harmless. In the wide spectrum of decisions affecting proximate cause, we have developed a body of dialectics which has given us some boilerplate charges, many of which become logically distorted by the omission, addition or rearrangement of a single word or phrase. Moreover, proximate cause is one of the more elusive concepts developed by our jurisprudence. Its philosophic articulation by a court is difficult enough for a jury to apply empirically under the best of circumstances. When the jury is instead given conflicting instructions, first being told that more than one proximate cause may exist and then being told that the plaintiff must exclude every other efficient proximate cause in order to recover, we think it is impossible to assume that the jury obeyed the former and rejected the latter when it found that the defendant's negligence was not a proximate cause of Bender's death. The distinction between "a proximate cause" and "sole proximate cause" is a legal philologist's nightmare. It could hardly be expected that a lay jury would comprehend and correctly apply such a distinction in the fact of conflicting and inadequately defined instructions by the court.

In sum, Mississippi has concurred with the preponderant majority of other forums declaring that in contract interference cases the *but for* test is to be applied. The case law clearly recognizes a distinction between the *but for* and the *a* proximate cause criteria. The jury should have been instructed to apply the proper test. Since they were not, we must reverse and remand for a new trial.

Because the action must be retired, sound judicial husbandry indicates that we rule on those issues now presented which will probably recur on such retrial.

## II. ESTABLISHING LOST PROFITS

Although a number of Mississippi cases have dealt with the problem of damages due to lost profits, the standard recognized by Mississippi jurisprudence is not entirely clear. This is largely because of a 1935 precedent, Montgomery Ward and Co. v. Hutchinson, 173 Miss. 701, 159 So. 862, 863 (1935), allowing recovery of prospective profits, where the Mississippi court ruled:

> Appellant offers suggestions of several possibilities or contingencies which might have happened to defeat any profits. Under our jurisprudence, the rule as to uncertain or speculative damages does not apply to uncertainty as to the amount of the profits which would have been derived * * *.

Subsequent cases, while apparently timorous of specifically overruling *Hutchinson*, have certainly freighted the burden imposed on a *Hutchinson* type plaintiff. These more recent cases speak in terms of allowing only the recovery of profits which are ascertainable with reasonable certainty. *See e. g.,* United States Finance Co. v. Barber, 247 Miss. 800, 157 So.2d 394 (1963) and Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So. 2d 892 (1963). In the latter case the essential quantum of proof was declared to be that "based on sound fact and not on mere opinion evidence without factual support * * *. In tort cases, profits which are remote, speculative or uncertain are neither an element of damages nor evidence of damages."

■ So while Mississippi has made it clear that the lack of a perfect measure of damages does not preclude recovery for damages, it does hold that the most accurate and reliable evidence available should be required to prove anticipated profits. From Koehring Company v. Hyde Construction Company, 254 Miss. 214, 178 So.2d 838, 853 (1965), we get this statement:

> * * * a party * * * will not be permitted to escape liability because of the lack of a perfect measure of damages * * *. Therefore, a reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of loss is sufficient proof.

The Federal standard is no less stringent. Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005 (1st Cir. 1965); United States v. Alexander, 326 F.2d 736 (4th Cir. 1964). Of course, if either standard favored the admission of such evidence, it would be admissible. Rule 43(a), Fed.R.Civ.P. Our review of the record, however, indicates that despite numerous objections of the defendant and several limiting rulings by the court, Harrison's damage proof did not meet either standard.

At trial, Harrison established his loss of future profits by use of the following formula:

Capacity of farms for new
cattle during 1964–65....3500 head
Cattle actually bought during 1964–65............1276 head
Cattle short............. 2224 head
Customary death losses, 3 %..68 head
Price per average 400 lb. calf
at 15 cents per pound, plus
veterinary, feed, etc.......$ 105.00
Sale Price per fatted calf....$ 147.00
Profit per fatted calf........$ 42.00
Lost Profit (after deducting
customary death loss)....$86,352.00

The propriety of using this formula method of proving damages was argued at length in chambers, at which time the trial judge expressed his concern with such proof in these words:

> * * * just to say that if you had that money you would have bought a certain number of head of cattle, * * * and that if you could have bought that herd, you would have kept it for a certain length of time. * * * and then at a certain period you could have sold the herd and made a certain profit * * * looks to this Court like it is pure speculation.

However, Harrison contended that because of his vast personal knowledge of the cattle business, which qualified him to give expert opinion testimony in this field, and because he had personal knowledge of what he had specifically done with the twelve hundred and seventy-six cattle he was able to purchase, he should not be tried to any specific records. On the basis that a showing of the facts surrounding the purchase and processing of the twelve hundred and seventy-six cattle Harrison actually handled in this period was required in order to give a best obtainable evidence basis to the proof, the judge sustained Prather's objections to the bare use of the formula as a springboard from which to launch expert opinion.

Notwithstanding these initial objections and ruling, Harrison was later allowed to testify as an expert to establish lost profits, over a similar objection by Prather, on the basis of the formula alone, without supplying records upon which the various formula figures as to unit costs, death losses and sales prices were based. The only record supplied was a sheet out of a ledger, which showed the total dollar amount used to purchase cattle in 1964 without designating the number of cattle bought or any other facts which substantiated the formula.

The trial court this time declared that the proffered testimony was sufficient in the light of Prather's right to cross-examine Harrison on facts disclosed by Harrison's actual operating records. But for one thing, this reasoning is analogous to the reasoning which supports a procedure sometimes followed and approved in which an expert summary witness, such as an accountant, may produce the actual records from which his summary has been distilled then testify to the summary alone, leaving cross-examination to supply the probity that makes his condensation acceptable as proof of facts. However, an essential element in this procedure cannot be found in the case at bar. Prather claims that these documents had not been produced either in response to a subpoena duces tecum or the judge's clear requirement for production, and the record fails to show that such documentation was ever in fact produced.

There is no inherent conflict between the best evidence rule and the rules of evidence which permit the admission of expert testimony. This is true because an opinion based upon knowledge and experience is not admissible to supply fact proof which is reasonably available. For Harrison, although considered an expert in the cattle field, to testify simply as to his opinion, when actual records of what happened to the cattle purchased and processed on these very lands was not shown to be unavailable, does not satisfy the basic tenet of evidence that the highest degree of proof of which a case is susceptible must be produced. This is the Mississippi rule. Storm v. Green, 51 Miss. 103 (1875); King v. State for Use and Benefit of Murdock Acceptance Corp., Miss., 222 So.2d 393 (1969). It is the federal standard as well. Allen v. W.H.O. Alfalfa Milling Co., 272 F.2d 98 (10th Cir. 1959).

■ On retrial, Harrison should not be allowed to substitute his opinion, expert though it may be, when proof of actual facts that are more cogent is available and not produced. This ruling is not intended to preclude any showing that other cattle purchases or other use of loan funds could have introduced variants in the cattle operations he actually conducted. Decisions of that sort are committed to the discretion of the judge conducting the trial. What we rule here is that if basic fact records exist, those records, not opinions as to what they could have been, should form the evidentiary basis for introducing their content into this cause.

### III. ANTITRUST RECOVERY.

■ The district judge, in a special interrogatory, submitted to the jury the question of whether the alleged conspiracy to interfere with the Prudential loan was in restraint of interstate trade or commerce. The jury responded affirmatively. In a well-reasoned opinion, the trial judge ruled that the conspiracy had only a residual effect on interstate commerce, and, under the rule of reason, denied treble damages under the federal antitrust laws—specifically, 15 U.S.C.A.

§ 15 (1963). Harrison cross-appeals on this point, asserting that the antitrust laws are applicable when the plaintiff proves an unlawful restraint of trade and personal damages. We agree with the lower court that the application of this principle was a matter of law properly decided by the court and that the court correctly denied triple recovery.

The rule of reason as it has become known was set forth in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910). It has been approved and expounded in numerous cases. A concise example is the following language from Northern Pacific Railway Co. v. United States of America, 356 U.S. 1 at 4, 78 S.Ct. 514 at 517–518, 2 L.Ed.2d 545 (1958):

> "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition."

This Circuit is clearly committed to the application of this rule as a principle of law.

> The Rule of Construction is the Rule of Reason, which requires an interpretation in the light of broad public policy favoring competition and condemning monopoly. The courts are to decide whether conduct is significantly or reasonably anticompetitive in character or effect. North Texas Producers

Association v. Young, 308 F.2d 235 at 240 (5th Cir. 1962).

Prather was not alleged to have engaged in any practice considered a per se antitrust violation—i. e. price fixing, division of markets, group boycotts or tying arrangements. These activities are, without more, considered unreasonable restraints of competition and violations of the law's prohibition.

■ We do agree with Harrison's contention that the recovery of treble damages does not depend upon proving public injury. But the proposition that recovery is possible if an individual proves purely personal damages, does not establish the necessary element of restraint of commerce. Harrison's authorities consist entirely of per se violation cases or cases involving activities which by their nature and character had a monopolistic tendency. See, for example, Radiant Burners, Inc. v. Peoples Gas, Light and Coke Company, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). Such a monopolistic tendency is not present in the case at bar.

■ Our conclusions are best expressed by the following excerpt from the trial court's opinion:

> In summary the Court does not feel that the treble damage statute should be literally construed to achieve unreasonable results. Harrison v. Paramount Pictures, Inc., et al, 115 F.Supp. 312, E.D. of Penn. [75 S.Ct. 45, 99 L.Ed. 653] 1953 Aff., 211 F.2d 405, Cert. denied 348 U.S. 828. Nor does the Court feel that the antitrust acts provide a remedy for any and all torts that may effect interstate commerce. Hunt v. Crumboch, 325 U.S. 821 at 826, 89 L.Ed. 1954, 65 S.Ct. 267, 1945. "The antitrust laws were never meant as a panacea for all wrongs". Parmelee Transportation Co. v. Keeshin, et al, 292 F.2d 794 at 804, 7 Cir. 1961, Cert. denied 368 U.S. 944 [82 S.Ct. 376, 7 L.Ed.2d 340]. In the case sub judice the isolated residual restraint on interstate commerce caused by the conspiratorial act of a disgruntled partner has not significantly affected interstate commerce, and has not tended to monopolize any line of commerce, and

therefore does not fall within the bounds of the treble damage statute.

On remand, all reference to the antitrust claims should be excluded.

## IV. OTHER ISSUES.

Here again the wisdom of using special interrogatories in a complex factual situation is proven. See *Chief Judge Brown's* concurring opinions in *Horne v. Georgia Southern & Fla. R. R. Co.,* 421 F.2d 975 (5th Cir. 1970) and *Little v. Bankers Life and Cas. Co.,* 426 F.2d 509 (5th Cir. 1970). The answers of the jury to interrogatories concerning all issues in the cause other than the loan interference matter were free from error. We are therefore enabled to affirm the judgment on the various other items of damage covered in these interrogatories and eliminate these claims from consideration on remand. We do not reach the question of whether the court's action in providing a remittitur as an alternative to a new trial was still appealable after plaintiffs entered their remittitur without protest. We deem it inappropriate to now comment on the prior refusal of the trial court to allow the defendants to analyze the original tape recording, except to observe that the matter was one committed to the court's discretion. We have no way of knowing what factors may weigh in favor of or against such an appraisal of this critical piece of evidence on remand or even whether analysis will again be sought. We, therefore, leave the initial resolution of this issue, if it arises, to that court without comment.

Affirmed in part, reversed in part and remanded.

## ON PETITION FOR REHEARING AND PETITION FOR REHEAR-ING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.